FRANCIS M. EDWARDS, administrator with the will annexed, *vs.* INTERNATIONAL PAVEMENT COMPANY & others.

Suffolk. March 6, 7, 1917. — May 26, 1917.

Present: RUGG, C. J., BRALEY, DE COURCY, PIERCE, & CARROLL, JJ.

*Corporation,* Income bonds, Acts *ultra vires. Guaranty. Contract,* Construction. *Evidence,* Proof of foreign law.

In a suit in equity by a holder of income bonds of a corporation for an accounting and to compel the application of alleged net income to the payment of interest on the income bonds, it appeared that no interest ever had been paid on the

bonds, that the promise of the corporation to pay interest, contained in each bond, was, "to apply its net income as hereinafter described, in payment of interest on said sum of one thousand dollars at a rate not exceeding five per cent per annum in any one year upon the terms and conditions and in the manner herein set forth; said interest shall be payable semi-annually on the first days of January and July in each year if on such days net income as hereinafter described shall have been accumulated in cash in the Treasury of the Company sufficiently to pay two and one half per cent on the principal of all this series of First Income Bonds. Interest hereon shall not be cumulative. . . . The words 'net income' aforesaid, shall be construed to mean the net cash remaining in the Treasury of the Company after deducting a sum sufficient for the payment of all liabilities and expenses thereof, including all such amounts as the Directors of the Company shall authorize to be applied or paid for the purchase of any real or personal property, choses in action, rights or services that in the opinion of the Directors, may be necessary or convenient for the business of the Company, the intention being that the Company shall in no wise be limited in the improvement or extension of its business by the issue of these bonds." The corporation was engaged in the business of issuing licenses under certain patents and contracts owned by it for the use of asphalt for block pavements and tiles at a stipulated price or royalty for each block made or laid, and the number of corporations to which such licenses were issued by the principal corporation at no time exceeded seven. This was practically the corporation's sole business. The corporation covenanted to supply or cause to be supplied to its licensees the asphalt required by them. It obtained this asphalt under a contract with the Trinidad Asphalt Company, which provided that that company might ask for and receive from the corporation "a reasonable guarantee or assurance that the cargo so ordered shall be paid for by the party ordering the same, upon delivery thereof." A master to whom the case was referred found that, after making reasonable provision for the contingent and conditional liabilities of the corporation outstanding on the semi-annual interest days, there were only two such days during the period in question on which the cash in the treasury would have been enough to pay any interest on the bonds. The plaintiff's exceptions to the master's report were based on his contentions that various sums of money that ought to have been applied to the payment of interest on the bonds were appropriated for purposes which were *ultra vires* of the corporation. In regard to these contentions it was *held:*

1. That, as to guaranties by the corporation of payments by its licensees for cargoes of asphalt ordered by them from the Trinidad company, such guaranties were required by the contract of the corporation with that company, and that, in view of the charter and the peculiar business of the corporation, such guaranties, under the law of Connecticut as found by the master which governed the case, were not *ultra vires.*

2. That, as to loans of money or credit by the corporation to its licensees, such loans were shown by the evidence to have been incidental to the business of the corporation and its proper management and displayed good business judgment.

3. That, as to the acquisition of shares of stock in some of the licensee companies, it was shown that such shares had been taken as collateral security and afterwards had been accepted at an agreed price as part payment of a loan, or after a reorganization of a licensee had been purchased in the exercise of good business judgment as a step incidental to the corporation's business, or had been acquired

by means of a first mortgage on the real estate and plant of the licensee in a transaction that was incidental to the proper management of the corporation's business and which did not appear to have resulted in any loss.

4. That the same was true in regard to a contract relating to a portable asphalt block which the directors rescinded in good faith.

5. And that, as to all these matters, if under the terms of the income bonds the holder of such a bond had any standing to complain of them, none of the acts complained of was *ultra vires* of the corporation.

In the same case it was *held* that the master was right in deciding that on the interest days the corporation reasonably could reserve a suitable amount of cash to provide for the contingent or conditional liabilities outstanding at such dates.

In the same case it was *held* that the master was right in deciding, that by the correct construction of the bond no deduction was to be made on account of money appropriated or promised by the corporation for the payment of which it was not legally bound directly, contingently or conditionally, and that no deduction was to be made for operating expenses not already incurred nor to make good losses on account of capital.

In a suit in equity reported by a single justice for determination by this court upon exceptions to a master's report, the master's report contained the following statement: "The parties agreed that all Statutes of the State of Connecticut and all reported cases decided by the courts of that State might be referred to by me as if introduced in evidence. No such statute has been called to my attention. The only such cases which have come to my attention which seem to bear upon the questions raised in the case at bar are the following: [citing four cases]. These cases are hereby made a part of this report." It was *said*, "to avoid misapprehension," the matter not being in controversy, that on this record this court could not consider any statute or decision of Connecticut to be proved as a fact with the exception of the four cases expressly referred to.

BILL IN EQUITY, filed in the Supreme Judicial Court on November 10, 1911, and amended on March 2, 1916, by a holder of income bonds of the International Pavement Company, described in the opinion, in behalf of himself and all other holders of such income bonds and all other creditors similarly situated who might join therein, against the corporation named and its directors, for an accounting for all the receipts of and disbursements by the corporation since January 1, 1889, when the said income bonds were issued, and to compel the application of the net income of the corporation to the payment of interest on the said bonds.

The case came on to be heard upon the exceptions to the master's report before *Braley*, J., who reserved it for determination by the full court.

*R. G. Dodge*, (*R. S. Wilkins* with him,) for the defendants.

*W. H. Garland*, (*S. R. Cate* with him,) for the plaintiff.

DE COURCY, J.   The plaintiff is the administrator with the will annexed of the estate in this Commonwealth of Jabez Baxter Upham, late of New York.   He holds five unregistered $1,000 first income bonds of the International Pavement Company, which were acquired by his testator before January 1, 1893. In this bill against the said company (herein called the defendant) and the members of its board of directors he prays among other things for an accounting of the receipts of the company, and for payment to him of the proportion of the net income to which he shall appear to be entitled.   In view of the master's findings in favor of the individual defendants, it is unnecessary to recite the allegations and prayers with reference to them.   The real controversy before the master was whether, on any of the interest dates beginning July 1, 1893, and ending July 1, 1915, there was in the treasury of the company "net income" which should have been applied to the payment of interest on said bonds.

These bonds are part of a series of the par value of $400,000, dated January 1, 1889, and issued for the purpose of refunding certain outstanding obligations of the corporation.   No interest ever has been paid on any of them.   The material provisions of the income bond are as follows:

"The International Pavement Company hereby promises to pay to the bearer hereof or in case of registration, to the registered holder hereof, the sum of One Thousand Dollars of the lawful money of the United States of America on the first day of January, A. D. 1939, and the Company further promises to apply its net income as hereinafter described, in payment of interest on said sum of one thousand dollars at a rate not exceeding five per cent per annum in any one year upon the terms and conditions and in the manner herein set forth; said interest shall be payable semi-annually on the first days of January and July in each year if on such days net income as hereinafter described shall have accumulated in cash in the Treasury of the Company sufficiently to pay two and one half per cent on the principal of all of this series of First Income Bonds.   Interest hereon shall not be or become cumulative, that is to say, the Company shall at no time be under obligation to pay any interest hereon for any periods for which the payments of interest have been passed. . . . The words 'net in-

come' aforesaid, shall be construed to mean the net cash remaining in the Treasury of the Company after deducting a sum sufficient for the payment of all liabilities and expenses thereof, including all such amounts as the Directors of the Company shall authorize to be applied or paid for the purchase of any real or personal property, choses in action, rights or services that in the opinion of the Directors, may be necessary or convenient for the business of the Company the intention being that the Company shall in no wise be limited in the improvement or extension of its business by the issue of these bonds."

The master has tabulated the amount of cash in the treasury of the corporation (including bank deposits, loans, and stock which by agreement of the parties are to be regarded as cash) on each of the interest dates from July 1, 1893, to July 1, 1915. On many of the dates the amount was in excess of interest requirements. He construed the provisions in the bond with respect to payment of income as follows: "From cash in the treasury are to be deducted all direct liabilities of the corporation presently due whether incurred for operating expenses or for the increase of the capital assets of the corporation (such capital assets being in the opinion of the directors necessary or convenient for the business of the corporation), also such sum as under the existing conditions is reasonably sufficient to provide for the payment of direct liabilities presently existing, payment upon which is to be made in the future, and liabilities contingent on the failure of persons or corporations primarily liable to perform their obligations, or conditional on the performance of contractual obligations by parties contracting with the respondent corporation. No deduction is to be made on account of money appropriated or promised by the corporation for the payment of which it is not legally bound directly, contingently or conditionally. No deduction is to be made for operating expenses not already incurred, nor to make good losses on account of capital." After deducting from the cash in the treasury the outstanding direct liabilities, he finds there were but fourteen interest dates on which there was on hand the amount of cash which would be required to pay two and one half per cent on the outstanding first income bonds. And he further finds that after making reasonable provision for the contingent and conditional liabilities outstanding on those dates, the cash

in the treasury would have been enough to pay the interest on said bonds on only January 1, 1910, and January 1, 1911.

The International Pavement Company was organized under the laws of Connecticut in 1880, and has a usual place of business in Boston. The purposes for which the corporation was formed are stated in its articles of association as follows:

"To purchase, own, use and sell any Letters Patent, Inventions or rights under Patents pertaining to the manufacture of Artificial Blocks for pavement or other purposes, the making or vending of such productions and the sale of rights under such patents for royalties or otherwise; and to buy, sell, own and deal in any real or personal property necessary or convenient for the prosecution of said business, and generally to do all things incidental to said business and to the proper management thereof." As found by the master, the company has engaged in the business of issuing licenses under certain patents and contracts which it owns for the use of asphalt for block pavements and tiles at a stipulated price or royalty for each block made or laid; and the number of corporations so licensed by the defendant company at no one time exceeded seven. This has been practically the sole business of the company, though before 1884 it carried on the manufacture of asphalt blocks itself and the laying of pavement, and in 1913 and 1914 it again manufactured blocks. The asphalt which is used in the manufacture of blocks by the processes of which the defendant corporation has the patents, comes from a pitch lake in the island of Trinidad. The defendant covenants to supply or cause to be supplied to its licensees the asphalt required by them. Its right to obtain such asphalt is under a thirty-eight year contract made in 1892 with the Trinidad Asphalt Company, which agreement is still in force with the New Trinidad Lake Asphalt Company, Limited. This contract contained the following provision, in which the words "party of the First part" refer to the Trinidad Asphalt Company, the words "party of the Second part" to the defendant corporation, and the words "party ordering the same" to any licensee of the defendant corporation ordering asphalt from The Trinidad Company:

"At the time of giving an order for any cargo of Asphalt or Pitch, it shall be optional with the said party of the First part, to ask for & receive from the said party of the Second part a

reasonable guarantee or assurance that the cargo so ordered shall be paid for by the party ordering the same, upon delivery thereof, in cash or in bankable paper reasonably satisfactory to the said party of the First part."

The plaintiff has filed fifteen exceptions to the master's report. As to the first and fifteenth it is enough to say that they are objections to findings of fact, which we cannot review in the absence of the evidence.

The remaining ones are based on his contentions that various sums of money were appropriated for purposes which were *ultra vires* of the corporation, and in violation of the contract between the corporation and the bond holders; and that the moneys so paid or held in reserve in the treasury should be treated as cash on hand available for income bond holders. These exceptions relate to (1) the defendant's guaranties of payments by its licensees for cargoes of asphalt ordered by them from the Trinidad Company as required by the contract above recited; (2) loans of money or credit to its licensees; (3) its purchase of stock in licensee companies.

It is by no means clear that the plaintiff as an income bond holder has any standing to complain of these acts. By the terms of his bonds, as above set forth, his rights were subordinate to the expenditures which in the opinion of the directors might be necessary or convenient for the business of the company; and the master has found that the acts complained of were incidental to the business of the company and the proper management thereof and done in good faith. See *O'Connor Mining & Manuf. Co.* v. *Coosa Furnace Co.* 95 Ala. 614, 618; *Digney* v. *Blanchard,* 226 Mass. 335.

Assuming, however, that the question of *ultra vires* is open to the plaintiff, we proceed to consider his exceptions. The second refers to the said asphalt guaranties. As already stated the defendant's business was issuing licenses under its patents and contracts. The licensees at no time exceeded seven in number and often were in financial difficulties. Without the defendant's guaranty they could have obtained no asphalt and the result would be that the defendant's business would have been at a standstill. The master finds that the defendant met with a loss in only one instance; and that the expenditure was proper. While an ordinary business corporation has no power to become surety

for another corporation or individual, *Davis* v. *Old Colony Railroad*, 131 Mass. 258, in view of the charter and peculiar business of the defendant company, and the law of Connecticut as found by the master, and which governs this case, we are of opinion that the said contract of guaranty was not *ultra vires*.   *Smith* v. *Board of Water Commissioners*, 38 Conn. 208.

The plaintiff's third, fourth, twelfth, and (in part) thirteenth exceptions relate to loans of money or of credit by the defendant. The master finds that the loans to the Maryland Pavement Company, a licensee of the defendant, were needed to assist it through financial difficulties; that during the period covered by the loans this licensee paid a number of thousands of dollars in royalties to the defendant and that it was good business judgment on the part of the defendant to assist this company.  He also finds that the loans to the Lake Erie Asphalt Block Company, another licensee with which it did considerable business, were incidental to the business of the corporation and the proper management thereof, and displayed good business judgment.  And the same is true of the loan of $1,000 to one Cushing, in order to extend the business of the defendant corporation through the formation of a licensee company in St. Paul or Minneapolis.  We cannot say, on the facts found, that financial assistance so rendered as a proper incident of business, was *ultra vires* of this corporation.  *Platt* v. *Birmingham Axle Co.* 41 Conn. 255.  *Holmes* v. *Willard*, 125 N. Y. 75.  *Winterfield* v. *Cream City Brewing Co.* 96 Wis. 239.

Exceptions fifth, sixth, seventh and ninth relate to the acquisition of stock in licensee companies.  The stock in the Brandon Italian Marble Company had been held by the defendant as collateral on loans made for the benefit of the Maryland Pavement Company, and was finally accepted in part payment at an agreed price.  As above stated the loans were not *ultra vires*; and on the master's findings, this means of obtaining payment was in accordance with proper business management.  The stock of the Hastings Pavement Company was taken in part payment of the plant sold to it by the defendant corporation.  The purchase of one hundred and fifty shares of stock in the Block and Tile Pavement Company, and of one hundred and twenty-nine shares in the reorganized Maryland Pavement Company, on the findings of the master were good business judgment and incidental to the business of

the defendant corporation.  As to the purchase of stock in the Newcastle Asphalt Block Company, a competitor and former licensee, and the loan to that licensee secured by a first mortgage of its real estate and plant, the master finds that not only was the transaction incidental to the business of the defendant and the proper management thereof, but that it does not appear that the defendant has met with any loss in the transaction.  In none of these cases can we say that the master was wrong in finding that the stock transaction was not *ultra vires* of the corporation.

The same is true of the eighth exception, the contract respecting a portable asphalt block plant with Upham and Sargent, who were to organize the Railway Asphalt Block Company and operate under a license from the defendant corporation.  And the finding that the directors rescinded the contract in good faith is conclusive in the absence of the evidence.

The eleventh exception raises the question, whether on the interest dates the defendant reasonably could reserve an amount of cash to provide for the contingent or conditional liabilities outstanding on such dates.  We think the master was right in ruling that such liabilities could be deducted under the terms of the bond.  See *Cochran* v. *United States*, 157 U. S. 286, 296.  The remaining exceptions, tenth and fourteenth, are disposed of by what has been said above.

The master has found that on two interest dates, namely, January 1, 1910, and January 1, 1911, net income had accumulated in cash in the treasury of the defendant corporation sufficient to pay two and one half per cent on the principal of all the first income bonds.  As bearing on this the defendant's second, fifth and sixth exceptions raise the question whether the master was correct in his construction of the bond, in deciding that from the cash in the treasury "no deduction is to be made on account of money appropriated or promised by the corporation for the payment of which it is not legally bound directly, contingently, or conditionally.  No deduction is to be made for operating expenses not already incurred, nor to make good losses on account of capital."  In our opinion the income bondholders could not be postponed to such claims, even under the liberal discretion given to the corporation by the terms of these bonds.  As matter of fact the offers to assist the Lake Erie Asphalt Block Company,

referred to in the fourth exception, were never accepted; and the corporation at no time set aside any specific sum for the sole purpose of carrying out any such offers, or for the purpose of working capital. The deductions allowed by the master were sufficiently favorable to the defendant.

As to the defendant's first exception, it is unnecessary to consider whether the master in construing "net income" was correct in ruling that "Income is not distinguished from capital. The distinction is between cash and other assets;" as it does not appear that on either of the material dates, January 1, 1910, or January 1, 1911, any of the cash on hand represented capital.

In the master's report it is stated: "The parties agreed that all statutes of the State of Connecticut and all reported cases decided by the courts of that State might be referred to by me as if introduced in evidence. No such statute has been called to my attention. The only such cases which have come to my attention which seem to bear upon the questions raised in the case at bar are the following [citing four cases]. These cases are hereby made a part of this report." To avoid misapprehension we may say that on this record we could not consider any statute or decision of Connecticut to be proved as a fact in the case, with the exception of the four cases expressly referred to. *Electric Welding Co. Ltd.* v. *Prince*, 200 Mass. 386.

The appeals from the decrees overruling the demurrers, and the defendant's third and fourth exceptions have been waived. All the other exceptions to the master's report must be overruled and the report confirmed. The plaintiff is entitled to two and one half per cent interest on his five bonds as of January 1, 1910, and January 1, 1911, with interest on the first amount from November 28, 1910, the date of demand, and on the second from January 1, 1911. As against the individual defendants the bill is to be dismissed.

*Decree accordingly.*