KEVIN HARRISON *vs.* NETCENTRIC CORPORATION & others.[1]

Middlesex. December 4, 2000. - March 14, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Practice, Civil,* Summary judgment. *Fiduciary. Corporation,* Close corporation, Stock. *Conflict of Laws. Contract,* Implied covenant of good faith and fair dealing, Interference with contractual relations.

The law of Delaware was applicable to a claim by a minority shareholder of a close corporation for breach of fiduciary duty; and where Delaware's law did not impose a heightened fiduciary duty on shareholders of a close corporation, the corporation and stockholders were entitled to summary judgment on such a claim. [468-472]

The clear and unambiguous provisions of a stock agreement and an employee noncompetition agreement, providing that the corporation had the right to buy back the employee's unvested shares at the original purchase price if the employee ceased to be employed by the corporation "for any reason . . . with or without cause," did not support a former employee's claim that the close corporation breached the implied covenant of good faith and fair dealing when it discharged him and made a demand to repurchase the employee's unvested shares, where there was no evidence that the unvested shares represented compensation earned but not yet paid. [472-476]

No evidence supported a claim by a shareholder and former employee of a close corporation that defendant directors of the corporation interfered with his at-will employment contract; in any event, the employment agreement provided that the employee could be terminated "for any reason or no reason." [476-479]

The clear and unambiguous provisions of a stock agreement and an employee noncompetition agreement required the employee to tender his unvested shares in the close corporation when the corporation exercised its right under the agreement to repurchase the employee's shares upon the termination of his employment. [479-480]

CIVIL ACTION commenced in the Superior Court Department on October 30, 1996.

The case was heard by *Judith Fabricant*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

[1]Northbridge Venture Partners, L.P.; Matrix Partners; Sean O'Sullivan; Edward Anderson; Tim Barrows; Robert Goldman; and Robert Ryan.

*C. Max Perlman* (*Robert E. Sullivan* with him) for the plaintiff.

*John G. Fabiano* (*Douglas J. Nash* with him) for the defendants.

*Cynthia L. Amara & Loretta M. Smith*, for Associated Industries of Massachusetts & another, amici curiae, submitted a brief.

COWIN, J. The plaintiff filed a complaint against his former employer, NetCentric Corporation (NetCentric); its chief executive officer, Sean O'Sullivan (O'Sullivan); four of its directors; and two venture capital firms that invested in NetCentric (collectively, the defendants).[2] The plaintiff alleged that the defendants breached their fiduciary duty of utmost good faith and loyalty; breached the implied covenant of good faith and fair dealing; wrongfully terminated his employment; and intentionally interfered with his contractual relations. All of the plaintiff's claims stem from his termination as an officer of Net-Centric and the company's attempt to repurchase from him certain shares of his stock pursuant to a stock restriction agreement (stock agreement). The plaintiff also seeks a declaration that NetCentric has no right to repurchase the stock for the stated price of $0.001 a share. The defendants asserted a counterclaim for specific enforcement of the purchase option provision of the stock agreement. A Superior Court judge allowed the defendants' motion for summary judgment on all the plaintiff's claims, and granted the defendants' motion for summary judgment on their counterclaim. The plaintiff appealed from the grant of summary judgment,[3] and we transferred the case to this court on our own motion. We affirm the judgment of the Superior Court.[4]

1. *Background.* We summarize the undisputed material facts. See *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. 763, 764 (2000). In 1994, the plaintiff, O'Sullivan, and his brother, Donal O'Sullivan (Donal) (collectively, the founders), discussed form-

---

[2]We acknowledge the amicus brief filed jointly by the Associated Industries of Massachusetts and the New England Legal Foundation.

[3]The plaintiff did not appeal from the judgment with respect to his wrongful termination claim.

[4]We affirm the entry of summary judgment in favor of the defendants on the plaintiff's claim of intentional interference with contractual relations but on different grounds from those of the Superior Court judge.

ing a business entity to develop a medium for delivering facsimile transmissions across the world by way of the internet. The founders agreed to a stock ownership arrangement whereby O'Sullivan would receive approximately 4.5 million shares, the plaintiff 2.9 million shares, and Donal 1.5 million shares. In need of financing, they obtained capital investment from Matrix Partners (Matrix) and Northbridge Venture Partners, L.P. (Northbridge). They incorporated NetCentric[5] the following year under Delaware law and established offices in Massachusetts.

O'Sullivan was named the chief executive officer and a director. At some point, he became the chairman of the board as well. The plaintiff served initially as the company's president, and later as its vice-president of sales and marketing, and as a director. Matrix and Northbridge received preferred stock and each appointed a director: Tim Barrows on behalf of Matrix, and Edward Anderson on behalf of Northbridge. Robert Goldman and Robert Ryan were named as outside directors.

The plaintiff executed a stock agreement and an employee noncompetition, nondisclosure, and developments agreement (noncompetition agreement). His stock agreement, executed May 16, 1995, provided that he would purchase 2,944,842 shares of stock in NetCentric at $0.001 a share. Forty per cent of the shares (1,177,938) would vest on May 1, 1996, and an additional five per cent (147,242) would vest each succeeding quarter, until all the shares were vested. According to the agreement, if the plaintiff ceased to be employed by NetCentric "for any reason . . . with or without cause," the company had the right to buy back his unvested shares at the original purchase price. All the plaintiff's unvested shares would vest immediately, pursuant to an acceleration clause, should NetCentric merge with, or be acquired by, another company.

Both the plaintiff's stock agreement and his noncompetition agreement contained clauses providing that the agreements did not give the plaintiff any right to be retained as an employee of NetCentric and that each agreement represented the entire agreement between the parties and superseded all prior agreements

---

[5]The company was originally incorporated as NetInfo Corporation. The name was changed to NetCentric Corporation in 1996.

and understandings relating to the same subject matter. In addition, the agreements contained a choice of law provision, providing that they "shall be construed, interpreted and enforced in accordance with the laws of the Commonwealth of Massachusetts."

In June, 1996, Donal's employment was terminated, and the company exercised its right pursuant to Donal's stock agreement to buy back his unvested shares. In September, 1996, the plaintiff's employment was terminated. At that time, forty-five per cent of the plaintiff's shares (1,325,180) had vested; the remaining fifty-five per cent (1,619,662) had not vested. A month later, NetCentric notified the plaintiff in writing that it was exercising its right pursuant to the stock agreement to buy back the plaintiff's unvested shares. The plaintiff has refused to tender the shares to the company.

During and after the time that Donal and the plaintiff were fired, NetCentric was in the process of hiring additional staff. New employees often were offered stock options in the company, issued from the employee stock option pool (pool), as part of their compensation packages. Some employee-shareholders expressed concern that this practice of authorizing new shares from the corporate treasury for issuance to new hires would dilute the value of their shares. Existing shares would not be diluted, however, if NetCentric acquired outstanding shares and offered those to new employees.

After Donal was fired, the number of shares in the pool was increased by the same number that NetCentric had repurchased from him. Within one month after the plaintiff's employment was terminated, NetCentric hired a president and two vice-presidents, one of whom replaced the plaintiff as vice-president of sales. All three new employees were granted stock options, totaling 1,812,500 shares.

2. *Standard of review.* Summary judgment is appropriate where there is no genuine issue of material fact and, where viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. See Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974); *O'Sullivan* v. *Shaw*, 431 Mass. 201, 203 (2000).

3. *Breach of fiduciary duty.* Initially, we must resolve a choice

of law question. As a minority shareholder in a close corporation,[6] the plaintiff maintains that the defendants owed him a duty of good faith and loyalty and that they breached this duty by terminating his employment in order to repurchase his unvested shares. This claim is based on Massachusetts law, which provides that shareholders in a close corporation owe each other the duty of "utmost good faith and loyalty." *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 848-849 (1976) (majority shareholders breached fiduciary duty by taking adverse employment actions against minority shareholder in order to pressure him into selling his shares at less than fair value); *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593 (1975) (failure to offer to purchase minority shareholder's shares at same price as offered to another shareholder was breach of fiduciary duty).

The defendants claim, however, that Massachusetts law is of no avail to the plaintiff, as Massachusetts law is inapplicable to his fiduciary duty claim; NetCentric is a Delaware corporation, Delaware law applies, and Delaware law does not impose the heightened fiduciary duty of utmost good faith and loyalty on shareholders in a close corporation. See *Riblet Prods. Corp.* v. *Nagy*, 683 A.2d 37, 39 (Del. 1996) (noting that Delaware has not adopted duty of utmost good faith and loyalty established in *Wilkes* v. *Springside Nursing Home, Inc., supra*); *Nixon* v. *Blackwell*, 626 A.2d 1366, 1380-1381 (Del. 1993) (declining "to fashion a special judicially-created rule for minority investors"). Instead, under Delaware law, minority shareholders can protect themselves by contract (i.e., negotiate for protection in stock agreements or employment contracts) before investing in the corporation. Additionally, founding shareholders can elect to incorporate the company as a statutory close corporation under Delaware law, which provides special relief to shareholders of

---

[6]We define a close corporation as "typified by (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 529 n.34 (1997), quoting *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 586 (1975).

such corporations.[7]

To avoid the imposition of "conflicting demands," "only one State should have the authority to regulate a corporation's internal affairs — matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." *Atherton* v. *Federal Deposit Ins. Corp.*, 519 U.S. 213, 224 (1997), quoting *Edgar* v. *MITE Corp.*, 457 U.S. 624, 645 (1982). Traditionally, we have applied the law of the State of incorporation in matters relating to the internal affairs of a corporation (including both closely and widely held corporations), such as the fiduciary duty owed to shareholders. See *Wasserman* v. *National Gypsum Co.*, 335 Mass. 240, 242 (1957); *Beacon Wool Corp.* v. *Johnson*, 331 Mass. 274, 279 (1954); *Edwards* v. *International Pavement Co.*, 227 Mass. 206, 212-213 (1917). The plaintiff claims that we abandoned this "one-factor test" in *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 511 (1997), in favor of a "functional approach" that applies the law of the State with the most "significant relationship" to the particular issue. In the *Demoulas* case, we recognized a recent trend in our cases applying the functional approach to resolving choice of law questions. See *id.*, and cases cited. See also *Nile* v. *Nile*, 432 Mass. 390, 401 (2000) (breach of contract); *Kahn* v. *Royal Ins. Co*, 429 Mass. 572, 572-573 (1999) (statutes of limitations); *Cosme* v. *Whitin Mach. Works, Inc.*, 417 Mass. 643, 646 (1994) (statutes of repose); *Bushkin Assocs.* v. *Raytheon Co.*, 393 Mass. 622, 631 (1985) (Statutes of Frauds).

We followed this functional approach in the *Demoulas* case because the company involved was formed originally in Delaware but later merged into a Massachusetts corporation. We applied Massachusetts law to conduct that occurred both when the company was a Delaware corporation and later when

---

[7]The special protections apply only to a corporation "designated as a 'close corporation' in its certificate of incorporation, and which fulfills other requirements, including a limitation to 30 on the number of stockholders, that all classes of stock have to have at least one restriction on transfer, and that there be no 'public offering.' " *Nixon* v. *Blackwell*, 626 A.2d 1366, 1380 (Del. 1993), citing Del. Code Ann. tit. 8, § 342. There is no claim that NetCentric is a statutory close corporation under Delaware law.

it was a Massachusetts corporation because, in the "particular circumstances" of that case, we concluded that this State had a more significant relationship to the issues presented. See *id.* at 511. We determined that "[a]pplying two different sets of State laws to the activities of a corporation whose existence was, for all practical purposes, continuous throughout the period, would be a cumbersome and unnecessarily formalistic exercise."[8] *Id.*

The *Demoulas* case was an exceptional one, as it concerned a company that had changed its State of incorporation as well as conduct that spanned both periods; thus, we conducted a functional analysis to determine which State had the more significant contacts. Nothing in our decision, however, suggested that we were overruling our long-standing policy of applying the law of the State of incorporation to internal corporate affairs.[9] See *id.* (explicitly stating that we need not address whether we should continue to follow the State of incorporation principle). Today, we adhere to and reaffirm our policy that the State of incorporation dictates the choice of law regarding the internal affairs of a corporation.

Our decision accords with that of a majority of the jurisdictions that have addressed this issue. See, e.g., *Atherton* v. *Federal Deposit Ins. Corp.*, *supra* at 224 ("States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care"); R.W. Southgate & D.W. Glazer, Massachusetts Corporation Law and Practice § 16.5[d], at 541-542 n.102 (Supp. 1998, 1999), and cases cited. Similarly, our policy is consistent with the Restatement (Second) of Conflict of Laws § 302 (1971), which provides that the rights and liabilities of a corporation are generally determined by the law of the State of incorporation. See Model Business Corporation Act § 15.05(c) official com-

---

[8]We noted that, "[a]rguably, claims arising from occurrences while [the company] was a Delaware corporation should be determined according to Delaware law." *Demoulas, supra.*

[9]*Demoulas* could not have influenced the decision of the founders to incorporate NetCentric in Delaware, as that choice was made prior to our *Demoulas* decision. Further, the plaintiff signed the stock agreement, which provides that NetCentric is a "Delaware corporation." If the founders had desired that Massachusetts law govern, they could have incorporated in this State.

ment (1998) ("Section 15.05[c] preserves the judicially developed doctrine that internal corporate affairs are governed by the state of incorporation even when the corporation's business and assets are located primarily in other states"). This rule furthers the interests of "certainty, predictability and uniformity of result, ease in the application of the law to be applied and, at least on occasion, protection of the justified expectations of the parties." Restatement (Second) of Conflict of Laws § 302 comment g, at 311. All three founders, including the plaintiff, deliberately chose to incorporate in Delaware. By so doing, they "determine[d] the body of law that [would] govern the internal affairs of the corporation and the conduct of their directors. . . . The corporation and its shareholders rightfully expect that the laws under which they have chosen to do business will be applied." *Hart* v. *General Motors Corp.*, 129 A.D. 2d 179, 184-185 (N.Y. 1987).

The unusual circumstances involved in the *Demoulas* case are not present in the case before us. We apply the general rule that the law of the State of incorporation governs claims concerning the internal affairs of a corporation, including the treatment of alleged breaches of fiduciary duty. As NetCentric is, and always has been, a Delaware corporation, Delaware law applies to the plaintiff's claim that the defendants breached their fiduciary duty.[10] Because Delaware law does not impose a heightened fiduciary duty on shareholders in a close corporation, see *Riblet Products Corp.* v. *Nagy, supra* at 39; *Nixon* v. *Blackwell, supra* at 1380-1381, the standard on which the plaintiff bases his cause of action, summary judgment was properly granted to the defendants on this claim.

4. *Breach of implied covenant of good faith and fair dealing.* The plaintiff next claims that the defendants violated the implied

---

[10]That the plaintiff's stock and noncompetition agreements provide that they are governed by Massachusetts law does not mean that the plaintiff's breach of fiduciary duty claim must also be governed by the law of this State. The Restatement distinguishes between the law that governs corporate acts with respect to third persons and the law that governs the corporation's relationship to its shareholders. See Restatement (Second) of Conflicts of Law, *supra* § 302 comment e, at 309 ("There is no reason why corporate acts [such as the making of contracts] should not be governed by the local law of different states").

covenant of good faith and fair dealing implicit in all Massachusetts contracts, including contracts for employment at will. See *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 104-105 (1977). The *Fortune* case and its progeny provide that an employer is accountable to a discharged employee for unpaid compensation if the employee is terminated in bad faith and the compensation is clearly connected to work already performed. See *id.* See also *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 304 (1982); *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 672 (1981) (*Gram I*); *Sargent* v. *Tenaska, Inc.*, 108 F.3d 5, 8 (1st Cir. 1997). The plaintiff argues that the defendants terminated his employment in bad faith because they were trying to prevent his remaining shares from vesting; that his unvested shares represent compensation previously earned; and that he was unlawfully deprived of this compensation by the defendants' attempt to repurchase his unvested shares.

In support of his contention, the plaintiff relies on the fact that he accepted a salary substantially lower than he had received in recent years because of the equity he received in NetCentric and because he expected he would be retained at least until his stock had fully vested. He also cites the fact that other employees received only stock options, while the founders received shares up front, and that all shares would immediately vest under the acceleration clause in his stock agreement should NetCentric merge with, or be acquired by, another company, a benefit granted only to the founders. The plaintiff claims that the unvested shares could not be considered payment for future services because they could have vested at any time in the event of a NetCentric merger.

The defendants did not deprive the plaintiff of any income that he reasonably earned or to which he was entitled. His shares vested over time only if he continued to be employed; thus, the unvested shares are not earned compensation for past services, but compensation contingent on his continued employment. The plaintiff's argument to the contrary is belied by the terms of his stock agreement. Under the agreement, the plaintiff's shares were to vest each quarter that he remained a NetCentric employee until they had fully vested. Should the plaintiff cease working for NetCentric for any reason, his right

to any unvested shares would terminate immediately, and the company could repurchase the shares at the original purchase price. The longer the plaintiff was employed by NetCentric, the more vested shares he would earn.

At the time the plaintiff's employment was terminated, forty-five per cent of his shares had vested. He had not yet earned the remaining fifty-five per cent. These unvested shares were contingent on the plaintiff providing future services for NetCentric, unless NetCentric merged with, or was acquired by, another company. See *Sargent* v. *Tanaska, Inc.*, *supra* at 8-9 (terms "vested" and "unvested" not automatically controlling, but periodic vesting schedule can define line between past and future services).

The plaintiff seeks support from *Cataldo* v. *Zuckerman*, 20 Mass. App. Ct. 731, 741 (1985), quoting *Gram* v. *Liberty Mut. Ins. Co.*, 391 Mass. 333, 334 (1984) (*Gram II*), in which the Appeals Court held that an employee's unvested interest in real estate development projects "was sufficiently an 'identifiable, future benefit . . . reflective of past services.' " The court concluded that the employee's interest in future projects was a "continuing inducement" to work for his employer and constituted "compensation for that continuing work." *Id.* at 740 ("Actual realization by Cataldo of the value of any share of the developer's equity was for the future, of course, but ownership of the possibility was intended to be and was part of Cataldo's day-to-day compensation for work currently being done"). Relying on this language, the plaintiff argues that his unvested shares constitute compensation already earned.

The *Cataldo* case, however, is easily distinguishable. When Cataldo was fired, some of the projects in which he had an interest were "then viable" (i.e., had already begun). It was his unvested interest in these "viable" projects that the Appeals Court determined was reflective of past services: on each project the employee had "already done a significant amount of work" and the project had "gone beyond the stage of a mere hope" to "a reasonable possibility of continuing on to completion." *Id.* at 741. Further, the court did not decide how the buy-back provision in the employee's contract (employer could repurchase employee's interest if his employment terminated during a

project) would affect the employer's liability under the *Fortune* doctrine, see *id.* at 742; rather, the court ruled that the jury reasonably found that the employer had not exercised its repurchase rights. See *id.* The court suggested that the exercise of these rights might have altered its decision. See *id.* (buy-back provision is option that could limit employer's liability).

In the present situation, the clause in the plaintiff's stock agreement, which provides for the immediate vesting of all unvested shares on a NetCentric merger or acquisition, is not proof that the unvested shares represent compensation for past services. The acceleration of the vesting period depends on an event that is unrelated to the plaintiff's role as an employee of NetCentric. Instead, it is related to the plaintiff's status as a founder and shareholder. See, e.g., *Merola* v. *Exergen Corp.*, 423 Mass. 461, 465 (1996) (investment in stock was investment in corporation's equity and "was not tied to employment in any formal way"). The founders likely negotiated an acceleration clause in order to protect their investments against a change of control within the company. It is unlikely that they would have considered the immediate vesting of unvested shares as payment for the plaintiff's day-to-day work as the vice-president of sales and marketing.

Further, NetCentric never merged with, or was acquired by, another company.[11] The *Fortune* doctrine does not protect interests contingent on an event that has not occurred. See *Mc-Cone* v. *New England Tel. & Tel. Co.*, 393 Mass. 231, 234-235 (1984) (no breach of good faith where plaintiffs denied salary increases and corresponding pension benefits due to alleged arbitrary performance evaluations); *Gram II*, *supra* at 336 (commissions from future indorsements not owed to employee as "[f]uture policy changes and future premium levels are speculative"). Such speculative interests are neither "clearly identifiable," *Cort* v. *Bristol-Myers Co.*, *supra* at 304, nor "clearly related to an employee's past service," *Gram I*, *supra* at 672. Cf. *id.* (employee entitled to commissions from policies already sold); *Fortune* v. *National Cash Register Co.*, *supra* at 105-106 (employee owed commissions on sales already made).

---

[11]Indeed, counsel for the defendants noted during oral argument that Net-Centric has ceased operations.

Because we conclude that the plaintiff's unvested shares do not represent compensation earned but not yet paid, we need not determine whether his termination occurred in bad faith.

5. *Intentional interference with contractual relations.* The plaintiff alleged in his complaint that the "defendants" intentionally interfered with his contractual relations by terminating his employment in order to repurchase his unvested shares.[12] He claimed that he had a contract providing that he would be employed by NetCentric, absent good cause, at least until all his shares had vested. He also claimed that the defendant directors were aware of this contract and voted to fire him. In their motion for summary judgment, the defendants argued that the plaintiff "had no employment contract" and thus his claim failed. The plaintiff responded that even if he did not have such an employment contract the defendants would not be entitled to summary judgment. He cited two cases, *Minasian* v. *Osborne*, 210 Mass. 250 (1911), and *Moran* v. *Dunphy*, 177 Mass. 485 (1901), where employees at will brought claims for tortious interference.

The Superior Court judge granted the defendants' motion for summary judgment based on her conclusion that the plaintiff did not have a contract promising him that he would not be fired without cause until his shares had fully vested. The plaintiff has not contested this conclusion, but argues that the judge should have considered whether he could recover for intentional interference with his at-will employment. This issue was raised sufficiently to merit resolution.

In an action for intentional interference with contractual relations, the plaintiff must prove that (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. See *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 397 (1996); *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476

---

[12]The plaintiff does not distinguish among the defendants on this claim; however, NetCentric cannot be liable for interference with contractual relations between itself and its employees. See *Appley* v. *Locke*, 396 Mass. 540, 543 (1986), and cases cited.

(1992). The nature of an at-will employment contract does not, by itself, preclude a finding that a relationship exists with which there can be tortious interference. See, e.g., *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997); *King* v. *Driscoll*, 418 Mass. 576, 587 (1994), *S.C.*, 424 Mass. 1 (1996); *Wright* v. *Shriners Hosp. for Crippled Children, supra* at 476. See also Restatement (Second) of Torts § 766 comment g, at 10-11 (1979) (agreement at will is "valid and subsisting," until terminated, and "defendant may not improperly interfere with it").

The plaintiff has produced no facts demonstrating that the defendant directors Anderson (on behalf of Northbridge), Barrows (on behalf of Matrix), Goldman, or Ryan interfered with his at-will contract. The plaintiff admitted that he had no personal knowledge concerning whether the directors participated in the decision to fire him, and he has adduced no admissible evidence, beyond his own unsubstantiated assertion, that these defendants or their respective employers participated or were in any way involved in the decision to terminate his employment.[13] Therefore, summary judgment was properly granted for the defendant corporation, Northbridge, Matrix, Anderson, Barrows, Goldman, and Ryan on this claim.

To maintain a cause of action for tortious interference against O'Sullivan, the plaintiff must show that O'Sullivan was not a party to his at-will employment contract and that O'Sullivan improperly interfered with this contract. A party to the contract cannot be held liable for intentional interference. See *Appley* v.

---

[13]The plaintiff claims that each of the defendant directors voted to terminate his employment. He relies on the deposition testimony of Paul English, a vice-president of NetCentric, who stated that O'Sullivan or Paul MacKay, president of NetCentric, "*told* [him] that the board [of directors] was involved . . . voted to terminate" the plaintiff's employment (emphasis supplied).

The burden is on the proponent of the evidence to establish' that the statement is admissible. English did not identify whether O'Sullivan or MacKay was the source of his information. Cf. *Martin* v. *State*, 726 So. 2d 1210, 1213 (Miss. Ct. App. 1998) (statement inadmissible where witness could not identify speaker). Because MacKay is neither a defendant nor an agent of any of the individual directors, the statement is hearsay if he were the speaker. See Proposed Mass. R. Evid. 801 (d) (2); P.J. Liacos, Massachusetts Evidence §§ 8.8.1, 8.8.6 at 496-497, 507 (7th ed. 1999). (MacKay's employment with NetCentric did not even officially begin until after the plaintiff had been fired.)

*Locke*, 396 Mass. 540, 543 (1986); *Mailhiot* v. *Liberty Bank & Trust Co.*, 24 Mass. App. Ct. 525, 528 (1987). Where the corporation and the individual defendant are indistinguishable, including, without limitation, where the individual is the corporation's sole stockholder, it would exalt form over substance to hold that the corporation could not be sued successfully in contract, but that the corporation's alter ego could be sued successfully in tort. Subject to rare public policy exceptions, employment at will can be terminated for any reason or for no reason. See *King* v. *Driscoll, supra* at 582; *Wright* v. *Shriners Hosp. for Crippled Children, supra* at 472. We would do considerable damage to this familiar policy if we permitted a tortious interference claim against an individual decision maker who is indistinguishable from the corporation itself.

On the record before us (which is the same as that before the Superior Court judge on the summary judgment motion), a question of material fact exists whether O'Sullivan and NetCentric are in fact indistinguishable. We note that O'Sullivan is a founder of the company, the chairman of the board, the chief executive officer, and a large shareholder of the closely held corporation.[14] In addition, the admissible evidence in the record indicates that O'Sullivan alone made the decision to fire the plaintiff. However, these facts do not permit us to conclude as a matter of law that O'Sullivan controlled the operation of the corporation to the degree that he should be viewed as its alter ego.

Nonetheless, even assuming that O'Sullivan could be distinguished from NetCentric, his bringing about of the termination of the plaintiff's at-will agreement does not constitute actionable "interference."[15] The plaintiff contends that he was fired for the purpose of recapturing his unvested

---

[14]It is unclear from the record exactly how many shares of common stock O'Sullivan owned.

[15]According to the Restatement (Second) of Torts, "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's [i.e., NetCentric's] performance of the contract." Restatement (Second) of Torts § 766 comment k, at 12 (1979).

The Restatement's comment also suggests:

"The interference is often by inducement. The inducement may be any conduct conveying to the third person the actor's desire to influ-

shares so that these shares could be issued to new employees without diluting the value of outstanding shares. The plaintiff, however, acknowledged in his stock agreement that his employment could be terminated "for any reason or no reason" and that NetCentric had the right to repurchase his unvested shares in the event that he ceased to be employed by the company. By signing this agreement, the plaintiff accepted that NetCentric had an interest in his unvested shares and that the vesting of those shares was connected to his continued employment relationship with NetCentric. Thus, the plaintiff implicitly agreed that his at-will contract could be interfered with in this manner: he was subject to discharge without cause, and NetCentric could exercise its right to repurchase the plaintiff's unvested shares. That is what occurred here, and the plaintiff has no grounds to object. We therefore conclude that, in these circumstances, there is no basis for a tortious interference claim against O'Sullivan, and we need not examine O'Sullivan's motive in firing the plaintiff.[16]

6. *The defendants' counterclaim.* The defendants filed a

---

ence him not to deal with the other. Thus it may be a simple request or persuasion exerting only moral pressure. Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made. Or it may be a threat by the actor of physical or economic harm to the third person or to persons in whose welfare he is interested. Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other.

"On the other hand, it is not necessary to show that the third party was induced to break the contract. Interference with the third party's performance may be by prevention of the performance, as by physical force, by depriving him of the means of performance or by misdirecting the performance, as by giving him the wrong orders or information."

*Id.* at 12-13.

[16]In an effort to clarify the law in this area, we note that in *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 815-817 (1990), we stated that we were "abandon[ing] the word malicious in the description" of the elements of a tortious interference claim, but we continued to define the improper interference required before a corporate officer could be liable in terms of "actual malice." See, e.g., *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997); *King* v. *Driscoll*, 418 Mass. 576, 587 (1994), *S.C.*, 424 Mass. 1 (1996); *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993). There is no practical difference, however, between "actual malice" and *improper* motives and means for purposes of this tort.

counterclaim seeking the return of the plaintiff's unvested shares. Pursuant to the plaintiff's stock agreement, NetCentric has the right to repurchase these shares if the plaintiff ceases working for the company for any reason and the company exercises its right in writing within sixty days after the plaintiff's termination. The plaintiff is then required to tender his unvested shares to NetCentric within ten days. It is undisputed that the plaintiff was fired, that fifty-five per cent of his shares were unvested, and that he received a letter from NetCentric exercising its repurchase rights within sixty days of his discharge. The plaintiff has refused to tender his unvested shares to the company. Accordingly, the defendants were entitled to summary judgment on their counterclaim.

We affirm the Superior Court's order allowing the defendants' motion for summary judgment on the plaintiff's claims and the defendants' counterclaim.

*So ordered.*