Gershengorn, J.
The plaintiff, Joseph Lorenc (“Lorenc”) brought this action in Middlesex Superior Court against his former employer, the defendant Be Free, Inc. (“Be Free”), and two of Be Free’s executives, the defendants Gordon Hoffstein (“Hoffstein”) and Stephen Joseph (“Joseph”). The Counts contained in Lorenc’s Verified Complaint are as follows:
Count I: Breach of Stock Option Contract
Count II: Breach of Fiduciary Duty (asserted against Hoffstein and Joseph)
Count III: Breach of Contract, Wrongful Discharge
Count IV: Breach of Contract, Failure to Maintain Harassment-Free Workplace as Set Forth in Employment Handbook
Count V: Breach of Implied Covenant of Good Faith and Fair Dealing
Count VI: Violation of Title I of the Americans With Disabilities Act
Count VII: Violation of the Massachusetts Civil Rights Act (asserted against Be Free and Hoffstein)
Count VIII: Loss of Consortium (brought by plaintiff Laurie Lorenc against all defendants)
The defendants removed this action to the United States District Court for the District of Massachusetts, and on January 31, 2003 Judge Gertner granted Be Free’s motion for summary judgment as to Count VI of the Complaint, and remanded the case to this Court for further proceedings. This matter is before the Court on the defendants’ motion for summary judgment as to all of the plaintiffs’ remaining claims, and on Lorenc’s cross motion for summary judgment as to Count I. For the reasons set forth below, the defendants’ motion for summary judgment is ALLOWED as to Counts I, II, IV, V, VII, and VIII, and DENIED as to Count III. Lorenc’s cross motion for summary judgment as to Count I is DENIED.
I. BACKGROUND
Pursuant to the summary judgment record, the undisputed material facts and the disputed facts viewed in the light most favorable to the non-moving party are as follows.
In late 1997, Be Free was a small internet start-up company specializing in on-line affiliate marketing. The founders of the company, Sam and Thomas Gerace, began to search for a management team that would encourage venture capital firms to invest in their company. To this end, the Geraces retained Hoffstein as Be Free’s Chief Executive Officer, and they also hired Joseph to serve as Be Free’s Chief Financial Officer. Hoffstein and Joseph had previously worked together at another technology company, PCs Com-pleat.
During the summer of 1998, Hoffstein began to contact other former PCs Compleat employees with whom he had worked to see if they were interested in working at Be Free. One such person was Lorenc, who had worked with Hoffstein for approximately six years at PCs Compleat.[3] Although Lorenc did not report directly to Hoffstein during their time together at PCs Compleat, Hoffstein was familiar with Lorenc and regarded him as a competent manager based upon his performance managing the sales department at PCs Compleat. In late August 1998, Hoffstein called Lorenc and invited him to a meeting to discuss the possibility of an employment opportunity at Be Free. Lorenc accepted this invitation, and a few days later he met with Hoffstein and Joseph for dinner.
At the dinner meeting, Hoffstein described the role in which he envisioned Lorenc as follows: “He [Hoffst-ein] described it as the department would be client services. It would be the most people-intensive department, meaning the largest department in the company, and that I would be responsible for building, managing, growing, leading the department.” (Lorenc Depo., p. 23.) Hoffstein then discussed the compensation package that Lorenc would receive if he decided to accept the position at Be Free. The package included a salary of $110,000 per year, an annual bonus of $25,000, and 1.5% stock ownership in Be Free, subject to a vesting period that had yet to be determined. As to the vesting period of the 1.5% share in Be Free, Lorenc testified as follows:
*640 Q: What exactly did Mr. Hoffstein say to you about the 1.5 percent ownership in the company? To the best of your recollection, what did he say to you?
A: To the best of my recollection, he said that I would receive 1.5 percent ownership of the company that would be my stake . . . [a]nd that there would be some schedule that had yet to be determined.
Q: Some schedule of what type?
A: There was no definitive plan, vesting plan.
Q: It was your understanding, at least from what Mr. Hoffstein said, was that there was going to be some stock plan put into effect?
A: Right. And he said it would be a year and a half, two years tops.
Q: When you say a year and a half to two years tops, what do you mean?
A: He [Hoffstein] defined the process, he defined Be Free as a quick hit, and this would be one and a half to two years tops, which my understanding was would be one and a half to two years forthat I’d either be there or to reap the full rewards of the package he was presenting to me . . .
Q: Did you ask Mr. Hoffstein to be any more specific than that about the stock plan that would be put into effect?
A: Other than, you know, when he said that, it was still to be determined, and it would be a year and a half, two years tops, and all of those plans had to be worked out, I understood that it was to be worked out.
(Lorenc Depo., pp. 32-34.)
With regard to the proposed duration of Lorenc’s employment, Lorenc testified:
Q: And what did Mr. Hoffstein say about promising you employment until the stock vested?
A: He implied that we would work together as a team, that it would be a great ride, and how he looked forward to working with me throughout that time period. Promises made or implied, I would have to say, in layman’s terms.
Q: Other, than that, did he say anything else about promising you employment until the stock vested that you recall?
A: Implied.
Q: But did he say anything else, is what I’m asking you, Mr. Lorenc?
A: Anything else. Not that I recall. . .
Q: At the dinner meeting did you ask Mr. Hoffstein under what circumstances your employment could be terminated?
A: No.
(Lorenc Depo., pp. 37, 41.) After Hoffstein discussed the terms of the proposal, he took out a piece of paper, wrote down “110 YR., 25 BONUS, 1.5%,” and asked Lorenc if he was on board. Lorenc accepted Hoffstein’s offer, and he commenced his employment at Be Free at the end of August 1998.
As Vice President of Client Services at Be Free, Lorenc was responsible for the development and oversight of the Client Services Department (the “Department”). The Department’s goal was to ensure 100% client satisfaction. Although Hoffstein had concerns about Lorenc’s job performance from early on in his tenure at Be Free, Hoffstein authorized a bonus for Lorenc for the fall quarter of 1998. Lorenc was the only Vice President at Be Free to receive such a bonus.[4] In response to the perception that Lorenc was having performance-related issues, Be Free’s founder and Executive Vice President, Sam Gerace, attempted to intervene and assist Lorenc with client services issues. Hoffstein acknowledged that many of the problems that Be Free was experiencing with regard to client services had pre-dated Lorenc’s arrival at the company. When Lorenc would point this out to Hoffstein, Hoffstein would respond by saying, “Joe, that’s your job, I hired you to figure out how to fix those things, not to tell me how awful they were.” (Hoffstein Depo. p. 109.)
On December 30, 1998, Lorenc and Be Free jointly executed a Restricted Stock Agreement (“RSA”). Pursuant to the RSA, Lorenc was allowed to purchase 464,355 shares of common stock in Be Free at a purchase price of $.15 per share. The RSA further provides:
2. Purchase Option
(a) In the event that the Participant ceases to be employed by the company for any reason or no reason, with or without cause, prior to the fourth anniversary of the Grant Date,[5] the Company shall have the right and option (the “Purchase Option”) to purchase from the Participant, for a sum of $. 15 per share (the “Option Price”), some or all of the Unvested Shares.
3. Exercise of Purchase Option and Closing
(a) The Company may exercise the Purchase Option by delivering or mailing to the Participant, within 60 days after the termination of the employment of the participant with the Company, a written notice of exercise of the Purchase Option ... If and to the extent the Purchase Option is not so exercised by the giving of such a notice within such 60-day period, the Purchase Option shall automatically expire and terminate effective upon the expiration of such 60-day period.
(RSA. Pars. 2-3.) The RSA also provides for a vesting period of four years in total, with 25% of the shares vesting after one year, and 2.08333% vesting each month thereafter.
Sometime in January 1999, Be Free introduced an Associate Handbook whose stated purpose was to *641 “serve as a guide” in explaining the company’s “history, philosophy, employment policies, and associate benefits.” Under the section entitled “Notice," the handbook provides: “The policies in this handbook are to be considered guidelines. Be Free, at its option, may change, delete, suspend or discontinue any part or parts of the policies in this manual at any time without prior notice.” In a separate section entitled “ ‘At Will’ Employment,” the handbook provides: “Be Free recognizes that all employment with the company is on an ‘at will’ basis. Accordingly, Be Free recognizes its right to terminate or discontinue the employment of any associate for any reason with or without notice." The anti-harassment provision states: “Be Free provides a work environment that is pleasant, healthy, comfortable, and free from intimidation or hostility . . . [hjarassment, whether by fellow associate, manager, supervisor, vendor or customer, will not be tolerated.”
In mid-January 1999, Hoffstein met with several Be Free clients during a business trip. After he returned from the trip, Hoffstein sent Lorenc an email in which he indicated that some of Be Free’s clients were unhappy with Be Free’s Client Services Department.[6] In a subsequent meeting with Lorenc and another Department employee, Hoffstein expressed his anger and frustration with the performance of the Department, and with Lorenc’s performance, in particular. Hoffst-ein raised his voice and asked, “Why don’t you care? What the fuck is going on around here? Doesn’t anyone give a damn about our customers? You guys don’t fucking get it. What are we going to do to make these customers happy?” (Hoffstein Depo. p. 16.) Lorenc offered to resign during this meeting, and he told Hoffstein that he planned to tell the people in the Department that he was leaving because of Hoffstein’s abusiveness. Hoffstein told Lorenc that he could not mention anything to other Be Free employees about Hoffstein’s abusive behavior, and that if he did then Hoffstein would tell people that Lorenc had done a terrible job at Be Free. Lorenc ultimately decided to continue to work at Be Free.
Due to his continued dissatisfaction with Lorenc’s job performance, in early March 1999, Hoffstein hired a recruiter to locate a replacement for Lorenc. On April 8, 1999, Hoffstein called Lorenc into his office and told him that he had made the decision to terminate Lorenc’s employment at Be Free. Hoffstein stated that since he himself was not an expert in customer service, and since it had become apparent to him that Lorenc was not keeping Be Free’s clients happy, Hoffstein felt that the best way to proceed would be to replace Lorenc with someone more experienced in the area of customer service. Over the next several days, Lorenc and Hoffstein had additional discussions about the possibility of Lorenc switching to a new position within the company. On April 14, 1999, Lorenc signed a severance letter that had been prepared by Be Free, the terms of which provided, in relevant part:
This is to confirm our agreement that your separation date from Be Free will be effective as of April 30, 1999. At that time the following severance plan will take effect:
Your semi-monthly severance pay in the amount of $5625 will be paid through October 31, 1999.
All vacation accrued through April 30, 1999 will be paid to you on April 30, 1999.
Be Free will make COBRA payments for the period of May 1, 1999 through October 31, 1999.
77,393 shares of your restricted stock will be forward vested.
Please sign below to indicate your agreement with the above.
Since Hoffstein was still exploring other options for Lorenc within the company, he told Ina Lavin (“Lavin”), Be Free’s human resources manager, to file away Lorenc’s severance letter. However, on April 23, 1999, Hoffstein told Lorenc that he had not been able to find another position for Lorenc at Be Free, and that therefore his employment would indeed be terminated. Hoffstein told Lorenc, “I will never work with you again.” (Hoffstein Depo. p. 167.) Hoffstein requested that Lorenc work through April 30 in order to help train his replacement and facilitate the transition process.
Lorenc declined to work through April 30, and instead he sent an email to his fellow employees at Be Free on the afternoon of April 23, 1999 in which he stated: “Today is my last day working at Be Free. It has been a pleasure to work with each of you. I wish you the best of luck in the future.” Lorenc turned in his keys and employee identification badge at an exit interview with Lavin on April 23. Although exit interviews at Be Free are usually conducted on the employee’s termination date, Lavin testified that in situations where the employee does not work through his/her termination date, the exit interview is conducted prior to the termination date. (Lavin Depo. p. 108.) During the exit interview, Lavin asked Lorenc if he was going to work the following week. Lorenc told her that he could not come in, and he told her to “(j]ust consider I called in sick.” (Lorenc Depo. p. 244.)
Lorenc also signed an exit interview form on April 23, 1999. On the top of this form, Lorenc’s “separation date” was listed as April 30, 1999. The form contained a summary of the benefits to which Lorenc would be entitled. All of the calculations on this form reflected a termination date of April 30, 1999. The form stated that Be Free would commence COBRA payments on Lorenc’s behalf on May 1, 1999. Lorenc was to be paid for vacation time accrued through April 30, 1999. Lorenc was given a six-month severance package, and the exit interview form provided that his severance payments would be made until October 31, 1999, six months from April 30, 1999.
By letter dated June 24, 1999, Be Free notified Lorenc that it was exercising its option, pursuant to *642 the Restricted Stock Agreement (“RSA”), to buy back Lorenc’s unvested shards of Be Free stock for $.15 per share. On September 27,2000, Lorenc filed this action in Middlesex Superior Court.
II. DISCUSSION
A.Summaryjudgment Standard
Summary judgment is appropriate where there are no issues of genuine material fact, and the moving party is entitled to judgment as a mater of law. Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 643-44 (2002), citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); see also Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis, 410 Mass. at 716. When the non-moving party bears the burden of proof on an issue for which summary judgment is sought, that party must oppose the motion with admissible evidence on the issue in order to defeat the summaryjudgment motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When presented with a motion for summaryjudgment, the court must consider the evidence in the light most favorable to the non-moving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995).
B.Breach of Stock Option Contract
In Count I of his Complaint, Lorenc alleges that Be Free breached the terms of the RSA by exercising its option to buy back Lorenc’s unvested shares in an untimely manner. Lorenc’s position is that his employment at Be Free was terminated on April 23,1999, and that because Be Free did not exercise its option until June 24, 1999, the 62nd day after his termination, the purchase option had already expired by the time it was exercised. Be Free contends that it terminated Lorenc’s employment on April 30, 1999, and that therefore its exercise of the purchase option on June 24, 1999 occurred within the sixty-day period set forth in Paragraph 3(a) of the RSA.
Since an option provision in a contract confers a unilateral right to compel performance exclusively for the benefit of the holder, the language contained in the option provision must be strictly construed. Lewis v. Chase, 23 Mass.App.Ct. 673, 676 (1987) (internal citations omitted). “It is the established rule, both in law and equity, that time is of the essence of an option.” Hunt v. Bassett, 269 Mass. 298, 302 (1929). Therefore, it is incumbent upon Be Free to establish that it exercised the option in a timely manner.
This Court concludes that Be Free has met its burden in this case. The undisputed material facts in this case establish, as a matter of law, that Lorenc’s termination date was April 30, 1999. Lorenc’s severance payments, health insurance, and payments for unused vacation time all reflect a termination date of April 30, 1999. Lorenc himself signed two separate documents, the April 14, 1999 severance letter and the April 23, 1999 exit interview form, acknowledging that his termination date would be April 30, 1999.[7] Moreover, Lorenc told Ina Lavin during his exit interview on April 23, 1999 to “(j]ust consider I called in sick” for the following week. If Lorenc had in fact terminated his employment on April 23, 1999, then he certainly would not have had the right to “call in sick” for the following week. Therefore, since the undisputed material facts establish that Be Free exercised its buy-back option within sixty days of Lorenc’s termination date, Be Free is entitled to summary judgment on Count I of the Complaint.
C.Breach of Fiduciary Duty
Lorenc’s claim for breach of fiduciary duty against Hoffstein and Joseph is premised on the notion that Hoffstein and Joseph, the controlling shareholders at Be Free, owed a fiduciary duly to Lorenc, a minority shareholder. See Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593 (1975) (under Massachusetts law, majority shareholders owe a duty of “utmost good faith and loyalty” to minority shareholders). However, in Harrison v. NetCentric Corp., 433 Mass. 465, 472 (2001), the Supreme Judicial Court reaffirmed the general rule that “the law of the State of incorporation governs claims concerning the internal affairs of a corporation; including the treatment of alleged breaches of fiduciary duty.” The defendant corporation in Harrison was incorporated in Delaware, and therefore the Supreme Judicial Court applied Delaware law to the plaintiffs claim for breach of fiduciary duty. Id. at 472. Since Delaware does not impose a heightened fiduciary duty on shareholders in a close corporation, see Riblet Prods. Corp. v. Nagy, 683 A.2d 37, 39 (Del. 1996), the Supreme Judicial Court affirmed the trial court’s decision to grant summaryjudgment in favor of the defendant on the plaintiffs claim for breach of fiduciary duty. Harrison, 433 Mass. at 472.
Lorenc has not provided the Court with any meaningful distinction between this case and Harrison. Be Free is incorporated in the state of Delaware, and there is nothing in the summaryjudgment record to suggest that it has ever been incorporated in Massachusetts. The fact that Lorenc himself did not choose to incorporate Be Free in Delaware does nothing to alter the general rule that the law of the state of incorporation governs claims for breach of fiduciary duty. See Harrison, 433 Mass. at 470-72. Moreover, as noted previously, Delaware does not impose a heightened fiduciary duty on majority shareholders in a close corporation with regard to the employment of minority shareholders. See Riblet, 683 A. 2d at 39. Hoffstein and Joseph are therefore entitled to summaryjudgment on Count II of the Complaint.
*643 D.Breach of Contract, Wrongful Discharge
In Count III of his Complaint, Lorenc alleges that Be Free entered into a contractual relationship with him, whereby Be Free agreed to continue to employ Lorenc at least until his option to purchase 1.5% of Be Free’s stock had vested. Lorenc further alleges that Be Free breached its employment contract by terminating him prior to the time that his option had vested. Be Free contends that Lorenc was an at-will employee, and that therefore he could have been terminated at any time, with or without cause.
In the absence of a contract, express or implied, that employment is to extend for a definite period of time, employment is presumed to be on an at-will basis, and the employee may be fired at any time for any reason, or for no reason at all. Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9 (1988). “Whether there is a contract for services for a definite period of time . . . depends upon all the attendant conditions surrounding the agreement, as well as upon its terms, when the latter are not specific and clear.” Kravetz v. Merchants Distributors, Inc., 387 Mass. 457, 460 (1982), quoting Maynard v. Royal Worcester Corset Co., 200 Mass. 1, 4 (1908). Given the necessarily fact-specific nature of this inquiiy, there is little consensus regarding the quantum of evidence necessary to create a dispute of material fact as to whether or not there was a contract for a definite term. See Groppo v. Courier Corp., Civil No. 950383B (Middlesex Super. Ct. May 21, 1998) (Kottmyer, J.) (8 Mass. L. Rptr. 566), and cases cited.
Although Lorenc’s account of what transpired at the dinner meeting with Hoffstein and Joseph is not entirely clear, this Court concludes that Lorenc has submitted sufficient evidence upon which a jury could reasonably find that Lorenc and Be Free entered into an implied contract whereby Be Free agreed to employ Lorenc until his shares of Be Free stock had vested. As an initial matter, it should be noted that Lorenc and Hoffstein had worked together for approximately fourteen years prior to their dinner meeting. At the meeting, Hoffstein wrote the terms of his offer of employment out on a piece of paper: “110 YR, 25 BONUS, 1.5%.” Hoffstein told Lorenc that Be Free was a “quick hit” that would be “one and a half to two years tops,” which Lorenc took to mean that he would be able to reap the full rewards of Hoffstein’s offer of 1.5% within two years. Hoffstein stated that they “would work together as a team... throughout that time period."
It is undisputed that Lorenc understood at the time of the dinner meeting that his 1.5% share would be subject to a vesting period that had yet to be determined, and that this vesting period turned out to be four years, as opposed to the one and a half to two year period alluded to by Hoffstein at the dinner meeting. However, for purposes of determining whether there was an implied contract for employment for a definite term, this fact alone is not dispositive. Although the issue is a close one, this Court determines that viewing the evidence in the light most favorable to Lorenc, when Hoffstein told Lorenc that “they would work together as a team throughout that time period,” a jury could reasonably conclude that the “time period” Hoffstein was referring to was the vesting period for Lorenc’s 1.5% share, be it one and a half to two years or four years. Accordingly, the defendants’ motion for summary judgment as to Count III of Lorenc’s Complaint must be denied.
E.Breach of Contract, Failure to Comply With Employment Handbook
In Count IV of his Complaint, Lorenc alleges that Be Free breached its contractual duty, as set forth in the Associate Handbook introduced in January 1999, to “provide! ] work environment that is pleasant, healthy, comfortable, and free from intimidation or hostility” by allowing Hoffstein to swear at and intimidate Lorenc. Be Free contends that the aforementioned provision of the Handbook does not create a binding contractual obligation on the part of Be Free to provide a harassment-free work environment.
Upon analysis of the Be Free Associate Handbook, it is evident that the provisions contained therein do not grant Lorenc the right to pursue a breach of contract claim for failure to provide a harassment-free workplace. See O’Brien v. New England Tel & Tel Co., 422 Mass. 686, 693 (1996); see also Jackson v. Action for Boston Community Development, Inc., 403 Mass. 8, 14-15 (1988). Under the section entitled “Notice,” the handbook provides: “The policies in this handbook are to be considered guidelines. Be Free, at its option, may change, delete, suspend or discontinue any part or parts of the policies in this manual at any time without prior notice.” (Emphasis added.) There is no indication that Lorenc negotiated with Be Free over the terms of the Handbook. Moreover, the Handbook does not provide for a term of employment. To the contrary, the Handbook states that “all employment with the company is on an ‘at will’ basis ... Be Free recognizes its right to terminate or discontinue the employment of any associate for any reason with or without notice.” Therefore, based on the factors set forth by the Supreme Judicial Court in Jackson, supra, and reaffirmed in O’Brien, supra, Be Free is entitled to summary judgment on Count IV of the Complaint.
F.Implied Covenant of Good Faith and Fair Dealing
In Count V of his Complaint, Lorenc alleges that Be Free’s decision to terminate him prior to the time that his shares had vested was motivated by a desire to deprive him of the value of those shares, and that this conduct amounted to a violation of the covenant of good faith and fair dealing. An employer may be liable to a discharged employee for unpaid compensation under the implied covenant of good faith and fair dealing if the employee can show that he was terminated in bad faith, and that the compensation was clearly connected to *644 work already performed. See Fortune v. National Cash Register Co., 373 Mass. 96, 104-05 (1977).
As with Lorenc’s claim for breach of fiduciary duty, the Supreme Judicial Court’s decision in Harrison v. NetCentric Corp., 433 Mass. 465, 473-76 (2001), is dispositive of Lorenc’s claim for breach of the implied covenant of good faith and fair dealing. In Harrison, the Court held that a terminated employee could not recover unvested shares of stock under the implied covenant of good faith and fair dealing, because un-vested shares “do not represent compensation earned but not yet paid." Id. at 476. “(The plaintiffsj shares vested over time only if he continued to be employed; thus, the unvested shares are not earned compensation for past services, but compensation contingent on his continued employment.” Id. at 473.
Similarly, in this case the RSA set forth a vesting schedule pursuant to which Lorenc’s shares of stock would vest over time only if he continued to be employed at Be Free. Since the unpaid compensation which Lorenc seeks to recover is not, as a matter of law, “clearly connected to work already performed,” Be Free is entitled to summary judgment on Count V of the Complaint. Harrison, 433 Mass. at 473, citing Fortune, 373 Mass. at 104-05.
G. Massachusetts Civil Rights Act
In Count VII of his Complaint, Lorenc alleges that Hoffstein interfered with Lorenc’s exercise and enjoyment of his constitutional rights in violation of G.L.c. 12,11H, the Massachusetts Civil Rights Act (“MCRA”). Specifically, Lorenc alleges that Hoffstein interfered with his right to freedom of speech by telling Lorenc that he could not mention anything to other Be Free employees about Hoffstein’s abusive behavior, and that if he did then Hoffstein would tell people that Lorenc had done a terrible job at Be Free. Lorenc further alleges that Be Free is liable for Hoffstein’s actions under the doctrine of respondeat superior.
Lorenc’s claim fails as a matter of law because he cannot establish that the speech Hoffstein allegedly prevented him from exercising related to a matter of public concern. See Smith v. Commissioner of Mental Retardation, 409 Mass. 545, 551 (1991) (rejecting plaintiffs MCRA claim based on freedom of speech, since the plaintiffs statements about the disclosure of the contents of her personnel file could not be viewed as a citizen’s comments on matters of public concern, but rather were unprotected statements of an employee upon matters of only personal interest). Cf. Caron v. Silvia, 32 Mass.App.Ct. 271, 274 (1992) (reversing trial court’s granting of summary judgment in favor of defendant on plaintiffs MCRA claim because evidence supported an inference that plaintiff was speaking out about the broader public issue of anti-smoking policies, and not merely her “personal interests or internal office grievances”). Since Lorenc’s “right” to tell his co-employees about Hoffstein’s abuse does not relate to a matter of public concern, the defendants are entitled to summary judgment on Count VII of Lorenc’s Complaint.
H. Loss of Consortium
By Order,dated January 5, 2001, the United States District Court for the District of Massachusetts (Gerber, J.) allowed the defendants’ motion to dismiss the plaintiff Laurie Lorenc’s claim for loss of consortium as it applies to Counts I-VI of the Complaint, but denied the defendants’ motion to dismiss as to Count VII, Lorenc’s MCRA claim. Lorenc v. Be Free, Inc., 136 F.Sup.2d 1, 5 (D.Mass. 2001). A claim for loss of consortium on behalf of the spouse of an injured party may only be maintained where the injured party has a valid tort claim. Sena v. Commonwealth, 417 Mass. 250, 264 (1994) (“Although we have determined that a claim for loss of consortium is independent of the spouse’s cause of action . . . we have not repudiated the implicit prerequisite that the injured spouse have a viable claim”); see also Mouradian v. General Electric Co., 23 Mass.App.Ct. 538, 544 (1987). Given (1) Judge Gertner’s prior Order in this case predicating any recovery for loss of consortium on Mr. Lorenc’s MCRA claim; and (2) this Court’s conclusion that Mr. Lorenc does not have a valid claim under the MCRA, the defendants are entitled to summary judgment on Mrs. Lorenc’s claim for loss of consortium.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment is ALLOWED as to Counts I, II, IV, V, VII, and VIII, and DENIED as to Count III. Lorenc’s cross motion for summary judgment as to Count I is DENIED.

Prior to their tenure at PCs Compleat, Hoffstein and Lorenc also worked together for approximately eight years at MicroAmerica, Inc.

Hoffstein asserts that this bonus was designed to motivate Lorenc and to “get him on track.” (Hoffstein Depo., p. 103.)

The “Grant Date" referred to in Paragraph 2(a) of the RSA is November 2, 1998. (RSA, Par. 1.)

In an effort to rebut the defendants’ contention that Be Free’s clients were dissatisfied with the Department’s performance, Lorenc has submitted a copy of a market research study that Be Free commissioned from Mercator Ventures in March 1999. This study suggests that many of Be Free’s clients were actually pleased with the customer service that they received from Be Free.

The mere fact that these documents refer to April 30, 1999 as the “separation date," as opposed to the “termination date,” does not create any sort of ambiguity with regard to Lorenc’s termination date. US Trust v. Henley & Warren Mgmt., Inc., 40 Mass.App.Ct. 337, 343 (1996) (“Claims of ambiguity and fraud do not hold the line against summary judgment if the documents do not reflect ambiguity on the point in question, and the party resisting summary judgment adduces no evidence of ambiguity or fraud”). The documents in this case clearly demonstrate that Lorenc’s termination date was April 30, 1999.