Regina **DALEY**

v.

**WELLPOINT HEALTH NETWORKS, INC., UNICARE Life and Health Insurance Company, Sandra Arangio, Ellen L. Marino and Craig S. Piers.**

**No. Civ.A.99–CV–11464RGS.**

United States District Court,
D. Massachusetts.

May 14, 2001.

---

**31.** *See id.* at § 207.20(k)(1).

**32.** Danhauser Dep. at 20:23–21:4.

**33.** Orman Dep. at 25:17–20.

**34.** *See* Danhauser Dep. at 26:2–11.

**35.** *See* 33 C.F.R. § 207.20(b)(2).

*MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUM-MARY JUDGMENT*

STEARNS, District Judge.

On June 8, 1999, Regina Daley sued her former employer, UNICARE Life and Health Insurance Company (UNICARE), UNICARE's parent company, Wellpoint Health Networks Inc. (Wellpoint), and three UNICARE employees, Sandra Aran-

gio, Ellen Marino, and Craig Piers.[1] Daley alleges that she was fired for taking maternity leave after giving birth. UNICARE maintains that Daley was let go as part of a company-wide reduction in force.

Daley's Complaint alleges sex and pregnancy discrimination in violation of the Massachusetts anti-discrimination statute, G.L. c. 151B, § 4, and Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1) and § 2000e(k) (Counts I, III and IV), violation of Daley's rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654 (Count II), tortious interference with Daley's employment relationship with UNICARE (Count V), violation of Daley's rights under the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H and 11I (Count VI), and violation of the Massachusetts Maternity Leave Statute, G.L. c. 149, § 105(D) (Counts VII). On June 30, 2000, defendants filed a motion for summary judgment. On July 14, 2000, Daley filed an opposition and a cross-motion for summary judgment on her FMLA claim.[2] On January 25, 2001, the court heard oral argument.[3]

*FACTS*

In the light most favorable to Daley as the nonmoving party, the material facts are as follows.[4] UNICARE is a subsidiary of Wellpoint, a California-based managed care company. Daley was employed as a marketing coordinator in UNICARE's Charlestown office.[5] Craig Piers was General Manager and Chief Marketing Officer. Ellen Marino was the Human Resources Manager. The Director of Marketing Communications, Sandra Arangio, supervised the Marketing Communications Group (Group) and its six employees: Daley, Charles Deal, Kim Warner, Verna Miller, Robert Bischoff, and Pamela Kotarba.[6] Kotarba's job title was marketing assistant, a position listed besides Daley's on the Group's organizational chart. (Kotarba, as will be seen, plays an important role in Daley's case).

In January of 1998, Daley notified UNICARE that she was pregnant. Thereafter, Daley scheduled two prenatal visits during work hours. Daley notified Arangio three days in advance of each visit. On April 20, 1998, Daley informed Arangio that she had a prenatal visit scheduled for April 23, 1998, and that because she had begun her third trimester, her doctor had recommended bi-monthly visits. Arangio met with Daley to discuss the negative impact of the visits on the work of the Group. She then ordered Daley to make up the time she had missed. On April 28,

1. The Complaint was originally filed in Suffolk Superior Court. On July 8, 1999, defendants removed the case to the federal district court.

2. Daley also moved to strike the defendants' motion for summary judgment as untimely because it was filed two days after the dispositive motion deadline expired. Defendants argue that their tardiness is attributable to an innocent transcription error. Defendants concede that in fairness, Daley's equally tardy cross-motion for summary judgment should also be considered timely.

3. The hearing was originally scheduled for November 9, 2000, and then rescheduled to

accommodate a conflict with the court's schedule.

4. There are no disputed material facts regarding the FMLA claim.

5. Daley and other members of the Marketing Communications Group were previously employed by the John Hancock Mutual Life Insurance Company. The unit was acquired by Wellpoint and consolidated into UNICARE.

6. Wilson was a temporary agency employee assigned to the Group. Wilson became a permanent employee of UNICARE at virtually the same time Daley was terminated, a fact to which Daley attaches particular significance.

1998, Arangio held a Group meeting to talk over the disruptions caused by Daley's prenatal appointments. On April 29, 1998, Daley met with Marino and Marino's supervisor, Perry Rhodes, to discuss UNICARE's maternity leave policy. On May 1, 1998, Daley wrote to Marino and Arangio memorializing her understanding of the April 29th meeting.

> Because UNICARE does not yet have a formally written maternity leave policy in place, and previous information relayed to me has been inconsistent, I have summarized below my understanding of the information presented to me at the 4/29/98 meeting on this issue: ...
>
> • If a physician disables the employee prior to the expected delivery date, the employee can use her accumulated sick time up to the date of delivery or until sick time is exhausted, whichever comes first.
>
> • In addition to Short–Term Disability coverage, the employee is entitled to 12 weeks of unpaid leave under the Family Medical Leave Act (FMLA). These 12 weeks run simultaneously to the 6 or 8 weeks of short-term disability. During the FMLA period, the employer is required to retain the employee's job position, including compensation, benefits and other employment terms and conditions. And, if applicable, the employee must make arrangements to pay UNICARE her share of benefit premiums
>
> . . . .
>
> • According to UNICARE, the FMLA law requires an exempt employee to deduct time for prenatal doctor visits from the allotted 12 weeks of leave. However, if that same employee has an appointment unrelated to her pregnancy (i.e. dentist appointment, eye doctor's appointment, personal business appointment) time is not deducted.

On May 12, 1998, Roberta Lehman, a Senior Employee Relations Consultant, responded to Daley's letter stating that:

> [the] FMLA provides 12 workweeks of leave if the employee is disabled due to pregnancy. A doctor's certification is required to show that she has a "serious health condition" covered by FMLA or Wellpoint disability. FMLA may also be used to care for the newborn after birth, but the total time available is 12 workweeks. All types of leave, including Massachusetts pregnancy leave, FMLA, and Wellpoint disability run concurrently.

On June 2, 1998, Daley wrote to Vincent Buenrostro, the Vice President of Human Resources, complaining that she had been given conflicting advice about UNICARE's maternity leave policy.

> I am hoping you can help me. I work for UNICARE's Special Accounts in Charlestown, MA. On July 4, my husband and I are expecting our first child. During the past few months, I have spoken with several Human Resources representatives here to learn about UNICARE's maternity leave policy. Each discussion resulted in conflicting information. As a result, I recently tried to obtain definitive answers in writing to my still outstanding questions. I directed those questions to Ellen Marino, employee relations manager, Charlestown, but have not been successful in getting my questions answered. She feels that she has provided me with "all the information I need to make my decisions." She also referred me to the Employee Handbook, indicating that all my questions are answered by the book. This weekend, my husband and I reread all the appropriate sections of the hand-

book, and, unfortunately, our questions still stand.

On the next page, I have attempted to summarize the different versions of the maternity leave policy I've received to date. Based on all this information, I still have the following questions:

1. When do the 8 weeks of Massachusetts maternity leave begin—from date of delivery, or the first week after my last day of work?

2. Am I required to use ALL my accumulated sick-time first, or, am I required to use just 7 days (a.k.a the elimination period) and retain any remaining sick-time for use later? In either case, is this time part of the 8 weeks?

3. Based on your answers to questions 1 and 2, when does FMLA begin?

4. After speaking to CNA, I learned that there IS a distinction between a normal and cesarean delivery—6 weeks or 8 weeks postpartum respectively. So, if I have a normal delivery after my estimated due date of July 4, does this mean I am entitled to 6 weeks of STC after my date of delivery? And, is this time part of the allowed 8 weeks of Massachusetts maternity leave?

I am sure you can appreciate how frustrating it has been for me not having the accurate information I need to make my plans. As my expected delivery date is fast approaching, I would like to make informed decisions about my maternity leave. Would you please provide me with definitive answers to the above questions.[7]

On June 11, 1998, Daley's doctor ordered bed rest because of complications with the pregnancy. During Daley's absence from work, Kotarba and Bischoff performed the duties of her job.

On June 12, 1998, Vincent Buenrostro replied to Daley's June 2, 1998 letter.

Thank you for writing to me about your maternity leave. A team of experts from Legal, Employee Relations, and the Policy areas have assisted in answering your questions. Your answers follow:

1. Massachusetts maternity leave commences with your child's date of birth.

2. According to Wellpoint's disability policy (administered by CNA), CNA will pay short-term disability benefits only after all your accrued sick leave is exhausted. Therefore, in order to be eligible for disability payments, CNA requires you to first exhaust your sick leave. However, if you wish your maternity leave to be unpaid, you are not required to use sick leave. Please contact CNA at 1–(800) 262–7997 for further information regarding your insurance coverage.

 Sick leave used from the child's date of birth through 8 weeks would be considered part of the 8 week Massachusetts maternity leave.

3. Your FMLA began with the first prenatal visit scheduled during work hours as indicated by a doctor's visit schedule prepared by you and as discussed in the April 29 meeting with you, Ellen Marino, Penny Rhodes, Michael Petersen, Sandra Arangio, and your husband.

4. All short-term disability eligibility and payment decisions are made by CNA, your short-term disability insurance company. Please direct all your

---

7. Daley attached a three page chart cataloguing the allegedly inconsistent information she had received.

questions concerning policy provisions to CNA.

All postpartum time is included in the 8 weeks of Massachusetts maternity leave. . . .

On June 15, 1998, Daley submitted a General Leave Request Form. It stated, in pertinent part:

Type of Leave Requested:

X Family Medical Care (birth, adoption or foster care placement of a child)

Expected date of birth, adoption or foster care Placement 7-4-98

Leave Start Date: Leave End Date:
Estimated 7-6-98 Estimated 9-11/98

Daley also prepared a calendar listing June 12, 1998, as her last day of work. She claimed three weeks of paid sick time and disability leave, and as indicated, stated that she would return to work on September 14, 1998. On July 14, 1998, Daley gave birth.

On July 22, 1998, Marino responded to Daley's request for leave.

This correspondence will serve as official notice that we have received your request for leave time covered under the Family and Medical Leave Act of 1993 (FMLA). Effective May 17, 1998 any leave time taken in connection to the serious health condition specified in your request will be applied toward your FMLA entitlement. . . .

Except as explained below, you have the right under the FMLA for up to 12 weeks of unpaid leave in a 12–month period for the reason listed above. In determining your maximum leave entitlement, the company uses the "rolling backward" method. With the effective date being the first day you are covered under the FMLA for this current leave, the company counts back 12 months subtracting from the maximum 12 week entitlement allowed under the FMLA any previous FMLA time you may have used during the period. Currently, our records indicate that you are eligible for twelve weeks of leave under the FMLA.

Between August and December of 1989, UNICARE terminated fifty-three of its Massachusetts employees as part of a "reduction in force." Within the Marketing Communication Group, Arangio was asked to eliminate two positions. Arangio terminated Daley and Kim Warner. According to Arangio, she eliminated Warner's position because Warner had previously transferred out of the Group and her job duties had since been absorbed by another employee. On September 25, 1998, in a conference call with Daley and Piers, Arangio stated that she had decided to eliminate Daley's job because during Daley's absence other employees had assumed those of her duties that had not been shifted to UNICARE's California office. On September 28, 1998, Wilson became a permanent UNICARE employee. Shortly thereafter, as Kotarba was preparing to leave for a vacation, Arangio said: "I hope you don't have a baby."

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op. Society*, 3 F.3d 495, 497 (1st. Cir.1993). "An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor." *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 32 (1st Cir.1994). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

 Both sides have moved for summary judgment on the FMLA count. The FMLA provides that eligible employees (such as mothers of newborns) who have worked at least 1,250 hours during the preceding twelve months are entitled to twelve weeks of annual leave.[8] 29 U.S.C. § 2611(2)(A). A singular benefit to the employee is that upon her return from leave, she is entitled to be restored to her previous (or an equivalent) position. 29 U.S.C. § 2614(a)(1). When, however, the twelve weeks expires, the FMLA job protection also expires. UNICARE argues that Daley was terminated three weeks after her leave expired on September 4, 1998, when she was no longer covered by the FMLA.[9] Daley maintains that her leave "constructively" began on July 22, 1998, and therefore did not expire until October 15, 1998. The significance Daley attaches to July 22 stems from UNICARE's letter of that date explaining that it intended to use a "rolling backward" method of calculating Daley's FMLA leave. Daley's argument is not based on the FMLA, but on a Department of Labor (DOL) regulation requiring employers to designate leave as FMLA-qualifying within two days of receiving notice that the employee is requesting leave. *See* 29 C.F.R. § 825.208.[10] Daley's argument is that the regulation carries an implicit penalty awarding an employee an additional day of FMLA leave for each day the employer is late in making the designation (hence the

thirty-seven days of additional leave claimed by Daley). The argument is not neoteric, and has been almost uniformly rejected as inconsistent with the intent of the FMLA. *See Ragsdale*, 218 F.3d at 938 ("The provisions of the FMLA are noticeably bereft of any purpose to interfere with employer leave policies which grant greater leave rights than the FMLA or to require more generous leave plans than the minimum twelve weeks of unpaid leave mandated by the FMLA"). Indeed, the point of UNICARE's July 22 letter was to inform Daley that she was entitled to no less, but also to no more, than the FMLA guaranteed of twelve weeks of maternity leave.

 Daley's second argument is that the DOL regulations require an employer to prospectively designate company-paid leave (such as sick time and disability leave) as FMLA-qualifying for it to count as such. The argument, even assuming that if it has validity, is factually unsupportable. Daley was clearly informed by UNICARE that her paid leave would run *concurrently* with her FMLA leave *before* she submitted her request. On May 1, 1998, Daley wrote to Marino and Arangio acknowledging her

> understanding of the information presented to [her] at the 4/29/98 meeting.... In addition to Short–Term Disability coverage, the employee is entitled to 12 weeks of unpaid leave under the Family Medical Leave Act (FMLA). These 12 weeks run *simultaneously* to

---

**8.** Depending on the employee's benefit plan, some or all of the twelve weeks of guaranteed leave may be paid.

**9.** UNICARE calculated Daley's return to work date as September 7, 1998, by apparently counting eighty-four days forward from June 15, 1998, the date that Daley began her sick time and disability leave.

**10.** Several circuit courts have invalidated the regulation as exceeding DOL's rule-making authority. *See*, e.g., *Ragsdale v. Wolverine Worldwide, Inc.*, 218 F.3d 933, 937 (8th Cir. 2000); *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir.1999). *Cf. Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 935–936 (6th Cir.2000).

the 6 or 8 weeks of short-term disability. During the FMLA period, the employer is required to retain the employee's job position, including compensation, benefits and other employment terms and conditions. (Emphasis added).

Similarly, on May 12, 1998, Roberta Lehman, a Senior Employee Relations Consultant, wrote to Daley stating that the "FMLA provides 12 workweeks of leave if the employee is disabled due to pregnancy.... All types of leave, including Massachusetts pregnancy leave, FMLA, and Wellpoint disability run concurrently."[11] Daley's motion for summary judgment on Count II will therefore be denied and defendants' motion will be allowed. Defendants' motion for summary judgment on Count VII of the Complaint, alleging a violation of the Massachusetts Pregnancy Leave Act, will also be allowed as the state statute provides a shorter period of protected maternity leave than does the FMLA.

■ Defendants next argue that they are entitled to summary judgment on the sex and pregnancy discrimination claims (federal and state) because, even conceding to Daley the elements of a *prima facie* case, she has failed to produce evidence impugning UNICARE's explanation that she was terminated as part of a company-wide reduction in force. *See Matthews v.*

*Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 128, 686 N.E.2d 1303 (1997) ("If the defendant's reasons are not discriminatory, and if the plaintiff does not prove that they are pretexts, the plaintiff cannot prevail").

There is little doubt that an employer, consistent with its business judgment, may eliminate positions during the course of a downsizing without violating Title VII even though those positions are held by members of protected groups (pregnant women included).... The flip side of the coin, however, is that an employer who selectively cleans house cannot hide behind convenient euphemisms such as "downsizing" or "streamlining." Whether or not trimming the fat from a company's organizational chart is a prudent practice in a particular business environment, the employer's decision to eliminate specific positions must not be tainted by a discriminatory animus.

*Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 422 (1st Cir.1996).

Daley marshals her evidence of pretext as follows.[12] First, Patricia Wilson was hired as a permanent Group employee virtually the day Daley was terminated, suggesting that within the Group at least no reduction in force was occurring.[13] Second, Daley contends there were no materi-

---

11. In response to a further inquiry by Daley, Vincent Buenrostro wrote on June 12, 1998, that "[y]our FMLA [leave] began with the first prenatal visit scheduled during work hours as indicated by a doctor's visit schedule prepared by you and as discussed in the April 29 meeting...." The fact that UNICARE ultimately did not count the pre-leave visits against her FMLA leave does not alter the fact that Daley was told at the April 29, 1998 meeting (as evidenced by Daley's May 1, 1998 letter) that UNICARE had informed her that her disability benefits would run concurrently with her FMLA leave.

12. Daley's claim is one of disparate treatment rather than disparate impact. *See* Plaintiff's Brief, at 11. Thus, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as elaborated in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), applies.

13. Defendants argue that this issue is immaterial because Wilson was always a part of the Group. She simply went from being a full-time employee hired through a temporary agency to becoming a full-time employee of UNICARE.

al differences between her job and Pamela Kotarba's (who survived the reduction in force) other than the fact that she had taken maternity leave and Kotarba had not.[14] Third, Daley argues that bias can be inferred from the reason Arangio gave for choosing to eliminate Warner's and Daley's positions. Arangio stated that she chose these positions because other members of the Group had absorbed the duties of the two jobs. Daley argues that according to this reasoning an employee on maternity leave will always be a presumptive target for termination because her duties by definition will always have been assumed by co-workers during her absence. Fourth, Daley argues that discriminatory animus on Arangio's part is demonstrated by her convening of a Group meeting to discuss the "disruption" caused by Daley's prenatal visits. And finally, Daley points to Arangio's statement to Kotarba that she hoped that Kotarba "was not going to get pregnant."

 Addressing first what might appear the most damaging piece of plaintiff's evidence, defendants contend that under *Woodman v. Haemonetics Corp.*, 51 F.3d 1087 (1st Cir.1995), Arangio's alleged statement to Kotarba is inadmissible hearsay. Rule 801(d)(2)(D) states that "[a] statement is not hearsay if . . . [the] statement is offered against a party and is . . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." In *Woodman,* the Court of Appeals evaluated a conversation between a mid-level supervisor (LeBlanc) and the plaintiff Woodman, in which LeBlanc characterized a management discussion of impending lay-offs at a

meeting which she had attended: "These damn people—they want younger people here. They will be the one[s] that will be successful here." *Id.* at 1090. The Court reversed the district court's determination that the statement was hearsay.

The record reflects that LeBlanc was acting within the scope of her employment in (i) attending the HC management meeting, (ii) assessing the performance of bowl department employees under her supervision (including Woodman), *and* (iii) in recommending that Woodman be relieved from his duties. Thus, the circumstantial evidence proffered in the Woodman affidavit provided a plainly sufficient foundation, *see* Fed.R.Evid. 103(a)(2), for finding both that LeBlanc was directly involved in the reduction in force and that the excluded statement concerned matters within the scope of her employment. Indeed, any contrary suggestion is belied by HC's firm reliance on LeBlanc's adverse performance evaluation as the principal justification for its decision to terminate Woodman. Finally, the circumstantial evidence proffered in the Woodman affidavit attests, and the excluded statement itself reflects, that LeBlanc purported to be communicating to Woodman information acquired at the HC management meeting.

*Id.* at 1094. In other words, LeBlanc was commenting on the announced intentions of HC's senior management, she was "directly involved" in implementing the reduction in force, and the statement concerned matters within the scope of her employment. Arangio's alleged statement fits the latter two of the *Woodman* criteria, but not the first, as it does not purport

---

14. UNICARE contends that it is undisputed that Kotarba's job was dissimilar to Daley's. UNICARE's description of the competing jobs, however, suggests that both were sup-

port positions involving largely similar clerical functions. *See Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994).

to relate the views of UNICARE's upper echelon managers. This, however, is not determinative. UNICARE chose to vest Arangio with the unfettered responsibility for selecting employees to be terminated in her Group. Arangio was thus acting as UNICARE's agent and UNICARE would, under ordinary rules of agency, be vicariously liable for any discriminatory act on her part in carrying out the task that she had been delegated. There is, however, a critical difference with *Woodman*. The plaintiff in *Woodman* had heard the offending statement directly from the supervisor-agent, thus qualifying the statement as an admission under Rule 801(d)(2)(D). Here Daley purports to have heard the statement indirectly from Kotarba,[15] thus adding a layer of hearsay to what was permissible in *Woodman*. Thus, I agree with defendants, although not necessarily for the reasons advanced in their brief, that the statement, absent confirmatory testimony from Kotarba, is inadmissible.

Whether plaintiff's Title VII discrimination claim survives on her remaining evidence requires a brief explanation of recent changes in state and federal employment discrimination law. Massachusetts and federal law establishing the quantum of evidence a plaintiff must assemble to surmount the summary judgment bar has undergone a sea change of sorts, resulting in a convergence of the state "pretext only" and the federal "pretext plus" standards. In its authoritative explanation of the "pretext only" standard in *Blare v. Husky Injection Molding Systems Boston, Inc.*, 419 Mass. 437, 443, 646 N.E.2d 111 (1995), the Supreme Judicial Court had held that under "[t]he pretext only rule .... a plaintiff who has established a prima facie case and per-

suaded the trier of fact that the employer's articulated justification is not true but a pretext, is *entitled* to judgment." (Emphasis added). While the *Blare* holding precipitated extended debate among the employment bar, it was generally believed to mean what it said. *See McMillan v. Society for the Prevention of Cruelty to Animals*, 140 F.3d 288, 298 n. 4 (1st Cir.1998). The holding, however, was retracted in *Abramian v. President & Fellows of Harvard College*, 432 Mass. 107, 117, 731 N.E.2d 1075 (2000), where the Court, in a retrospective look at *Blare*, acknowledged that "[l]iterally applied, that language improperly compels a verdict for the plaintiff," a result that "[w]e never intended." "While there is some appeal in an instruction that *requires* a jury to find for a plaintiff who shows that the employer's reasons are untrue ... the [*Blare*] instruction should not [be] given because it strip[s] the jury of its fact-finding role." *Id.* at 117–118.

The federal "pretext plus" standard labored under an identical strain. In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), a majority of the Supreme Court appeared to reject the proposition that a plaintiff who disproves an employer's explanation for an adverse job action could prevail on that showing alone. "It is not enough ... to *dis*believe the employer.... Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of [discrimination]." *Id.* at 519, 523–524, 113 S.Ct. 2742. As Justice Souter pointed out in dissent, the majori-

**15.** Daley testified that she had called Kotarba after Kotarba returned from vacation and that Kotarba had told her what Arangio had said. Daley states that she wrote the statement down because "I was so shocked by this comment." Daley has offered no affidavit or other testimony from Kotarba verifying the statement.

ty's opinion was internally inconsistent. "In one passage, the Court states that although proof of the falsity of the employer's proffered reasons does not 'compe[l] judgment for the plaintiff,' such evidence, without more, 'will permit the trier of fact to infer the ultimate fact of intentional discrimination'.... But other language in the Court's opinion supports a more extreme conclusion, that proof of the falsity of the employer's articulated reasons will not even be sufficient to sustain judgment for the plaintiff." *Id.* at 535. The tension identified by Justice Souter was reflected in opinions in this circuit, among others. *Compare Lattimore v. Polaroid Corp.,* 99 F.3d 456, 465 (1st Cir.1996) ("When the *prima facie* case is very strong and disbelief of the proffered reason provides cause to believe that the employer was motivated by a discriminatory purpose, proof of pretext 'may' be sufficient [to warrant a finding for the plaintiff]," *with Dichner v. Liberty Travel,* 141 F.3d 24, 30 (1st Cir.1998)) ("At the proof-of-pretext stage, however, there is a critical difference [between state and federal law]. To prevail under federal law, it is insufficient for a plaintiff merely to undermine the veracity of the employer's proffered justification; instead, she must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination.").

■ The inconsistency in federal law was resolved in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147–148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), a case decided almost simultaneously with *Abramian.*

In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. (Internal citations omitted).

■ *Reeves,* when considered in tandem with the longstanding rule that summary judgment is disfavored in fact-intensive disparate treatment cases, opens the courthouse door somewhat wider to plaintiffs pursuing federal employment discrimination claims.[16] This case is a good example. While plaintiff's discrimination case, particularly when shorn of the hearsay statement attributed to Arangio, is a thin one, a reasonable trier of fact could find that Arangio's overt displeasure at the "disruption" caused by Daley's prenatal visits betrayed a discriminatory animus, and that Arangio's explanation that Da-

---

**16.** The door has always been open to supplemental state claims brought in tandem with claims under Title VII. *See Dichner,* 141 F.3d at 32–33.

ley's job had become redundant during her absence was simply a pretext masking the true reason why Daley was chosen for termination.

■ Defendants next argue that Daley has improperly named the individual defendants in her federal discrimination counts. This is an open issue in the First Circuit. *See Serapion v. Martinez*, 119 F.3d 982, 992 (1st Cir.1997). Absent authoritative guidance to the contrary, I have consistently read the language of Title VII, which is framed exclusively in terms of employer liability as permitting suit against the employer only.[17] Consequently, Count III and IV will be dismissed as against the individual defendants.[18]

■ Defendants next maintain that Daley's tortious interference claim against the individual defendants (Count V) fails because nothing plead in the Complaint establishes that they acted maliciously. "[T]o make out a claim for interference with advantageous business relations, the plaintiff must prove that (1)[s]he had a business relationship or contemplated contract of economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." *Kurker v. Hill*, 44 Mass.App.Ct. 184, 191, 689 N.E.2d 833 (1998). "The nature of an at-will employment contract does not, by itself, preclude a finding that a relationship exists with which there can be tortious interference." *Harrison v. NetCentric Corp.*, 433 Mass. 465, 477, 744 N.E.2d 622 (2001). However, "something more than intentional interference is re-

quired." *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815, 551 N.E.2d 20 (1990) (adopting Restatement (Second) of Torts, § 766 (1979)). *Cf. Harrison*, 433 Mass. at 479 n. 16, 744 N.E.2d 622 (while in *Geltman*, we "abandon[ed] the word malic[ious]" in describing the elements of the tort, "we [nonetheless] continued to define the improper interference required ... in terms of 'actual malice'"). *See King v. Driscoll*, 418 Mass. 576, 587, 638 N.E.2d 488 (1994) ("actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" is required to prove the tort). Thus, where a supervisor is acting within the scope of her responsibilities in terminating an at-will employee she is privileged to do so unless acting with "actual malice." *Clement v. Rev–Lyn Contracting Co.*, 40 Mass.App. Ct. 322, 325, 663 N.E.2d 1235 (1996). Because Daley has failed to present any evidence that any of the three individual defendants was either acting in defiance of the corporate interest, or with actual malice, Count V must be dismissed.

■ Finally, defendants challenge Daley's Massachusetts Civil Rights Act claims (Count VI). Where a statute provides a specific remedy, an action under a more general provision of law or the Massachusetts Declaration of Rights will not lie. Here plaintiff's specific remedy is provided by Chapter 151B. *See Charland v. Muzi Motors*, 417 Mass. 580, 582, 631 N.E.2d 555 (1994); *Agin v. Federal White Cement, Inc.*, 417 Mass. 669, 672, 632 N.E.2d 1197 (1994). The State Civil Rights Act is "a more general provision of law" and plaintiff is thus left to the exclu-

---

**17.** Title VII has no analogue to Chapter 151B's "aiding and abetting" provision which has been held to permit the naming of individual defendants in state discrimination suits. *See Beaupre v. Cliff Smith & Assoc.*, 50 Mass.App.Ct. 480, 491, 495 & n. 24, 738 N.E.2d 753 (2000).

**18.** Count IV is also brought pursuant to Title VII.

sive remedies of Chapter 151B. *See Mouradian v. General Electric Co.,* 23 Mass. App.Ct. 538, 503 N.E.2d 1318 (1987). Consequently, Count VI most be dismissed.

*ORDER*

For the foregoing reasons, Daley's motion for summary judgment on Count II is *DENIED.* Defendants' motion for summary judgment on Count I is *DENIED.* Defendants' motion for summary judgment on Count II, Count V, Count VI, and VII is *ALLOWED.* Defendants' motion for summary judgment as to Count III and Count IV is *ALLOWED* as to the individual defendants and otherwise *DENIED.* Plaintiff's motion to strike is *DENIED.*

SO ORDERED.