**Dion RHODES**

v.

**JPMORGAN CHASE & CO., J.P. Morgan Securities, Inc., Eric Beinstein, and Joseph Ghartey.**

**Civil Action No. 06–10886–RGS.**

United States District Court, D. Massachusetts.

June 24, 2008.

David J. Fried, Law Offices of David J. Fried, Cambridge, MA, for Plaintiff.

Joan I. Ackerstein, Heather L. Stepler, Matthew A. Porter, Jackson Lewis LLP, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiff Dion Rhodes brought this diversity action against her former employ-

er, JPMorgan Chase & Co. and J.P. Morgan Securities, Inc. (collectively JPMSI), and Eric Beinstein and Joseph Ghartey, two of its Managing Directors. The Complaint alleges pregnancy discrimination and retaliation under Mass. Gen. Laws ch. 151B. Rhodes alleges that she was unlawfully terminated by JPMSI six weeks after returning from maternity leave. She claims that defendants falsely told her that her position as head of research for the Equity Derivatives Strategy Group (EDG Strategy) was being eliminated when, in fact, it was being transferred to a newly-formed group headed by Beinstein. Defendants now move for summary judgment.

## BACKGROUND

The material facts are taken as presented by Rhodes and supplemented by facts set out by defendants that Rhodes does not dispute. Rhodes began working in the New York City office of JPMSI in 1986. During her 19–year career at JPMSI, she served in a number of departments, including the Credit and Loans Department, the Mortgage Backed Securities Group, and the Mortgage Backed Securities Research Group, before finally taking a research position with the Equity Derivatives Group (EDG) in 1996.

By April of 2003, Rhodes had been promoted to a Vice–Presidency, and was coordinating a five-member research team within EDG known as EDG Strategy.

She was earning, with discretionary bonuses, as much as $300,000 a year. After becoming involved with a Boston-area chiropractor (now her husband), Rhodes requested and received a transfer to the JPMSI office at Rowes Wharf.[1] Rhodes was the only member of the research team working out of Boston. She reported to two managing directors: Joseph Ghartey, head of training, and Adam Green, the head of marketing. Both Ghartey and Green worked in JPMSI's New York office.

By July of 2004, all EDG Strategy employees save Rhodes had been transferred to other jobs at JPMSI. Rhodes did not consider the transfers an indication that JPMSI intended to dissolve EDG Strategy. She was, however, aware that no effort was being made to recruit new employees to her team.[2] She did not seek a transfer to any other research group within JPMSI. In the fall of 2004, Rhodes began to assist William Shelton, the New York-based Vice–President of EDG, in the writing of marketing materials.[3] Rhodes made frequent trips to New York to work with Shelton, often staying a week at a time. Shelton considered Rhodes a valued employee.[4]

On November 23, 2004, Rhodes went on maternity leave. She began working three days a week on March 1, 2005, twelve weeks after the birth of her daughter. She resumed a full-time schedule on April

1. Rhodes and her husband married in November 2003. They purchased a home in Waban, Massachusetts in April of 2004. In February of 2005, substantial renovations to the house were made to accommodate a home-office for Rhodes's husband. Rhodes gave up her subleased apartment in New York City in April of 2005.

2. Defendants state that Rhodes's research duties consisted of proofreading computer-generated reports.

3. Rhodes characterizes the work as "preparing research reports with a marketing orientation."

4. In an e-mail to Green on November 18, 2004, Shelton wrote that Rhodes "has been very responsive and provided valuable work for the team. Her style needs work but she accepts direction well and is a good team player." Plaintiff's Ex. 5.

1, 2005, but was now solely occupied with work for Shelton's New York group.[5] Principally, she wrote and edited drafts and approved the content of marketing articles.

On May 11, 2005, Shelton flew to Boston and informed Rhodes that she was "not the right fit" for his group. Two days later, on May 13, 2005, Ghartey informed Rhodes that her position was being eliminated and that JPMSI was "completely eliminating research in equity derivatives."[6] Within the next few days, Rhodes complained to JPMSI's Human Resources Department, which had no knowledge that she was being terminated. According to defendants, EDG Strategy, of which Rhodes was the sole remaining member, was being eliminated because it was no longer a profit center for the firm. Client demand for EDG Strategy research had significantly decreased as technology had allowed for the automation of many of the reports that EDG Strategy had previously generated.

On or about May 18, 2005, Rhodes learned from Lawrence Chan, another JPMSI employee,[7] that equity derivatives research was not being eliminated (as Rhodes had been told by Ghartey), but was instead being transferred to a group headed by Eric Beinstein in New York.[8] Rhodes telephoned Human Resources to complain about the transfer of her job. On June 3, 2005, Jocelyn Donat, a JPMSI Human Resources officer, informed Rhodes of an open position in Beinstein's group. Donat sent Rhodes a position description and explained that there would be a restructuring of JPMSI's research areas under Beinstein.[9] Rhodes interviewed for the position with Beinstein in New York on June 16, 2005. She received a job offer shortly thereafter.

Rhodes's EDG Strategy position elimination/termination letter, dated June 17, 2005, had an effective date of August 15, 2005. Rhodes was offered forty-nine weeks of severance pay, career counselling services, and other benefits. Rhodes met with Beinstein again on July 11, 2005, to further discuss the offer of a job with his group. Notwithstanding the discussions, on July 20, 2005, Rhodes's attorney sent a demand letter to JPMSI's general counsel. A few weeks later, in an exchange of e-mails with Donat, Rhodes sought assurances on compensation, relocation expenses, and the formal description of the new job. Donat explained that it would be a lateral move and that Rhodes would

---

**5.** On March 30, 2005, Shelton sent an e-mail to the marketing team members introducing Rhodes as a Vice–President with nine years of experience in equity derivatives. He explained that Rhodes would take "the role as team leader on all marketing materials to make sure that they are consistent and well written." Plaintiff's Ex. 8.

**6.** Defendants dispute that Rhodes was ever told that JPMSI was eliminating all research in the area of equity derivatives. Ghartey, in his interrogatory responses, stated that "he informed [Rhodes] that the EDG [S]trategy area was being eliminated and he did not believe that other areas of [JPMSI] were picking up [her] EDG [S]trategy responsibilities." Plaintiff's Ex. 16, Interrog. Answer No. 6.

**7.** Lawrence Chan was a Vice–President of Information Technology. He covered for Rhodes while she was on maternity leave.

**8.** Beinstein headed the Credit Derivatives Research (CDR) Group. In 2005, his group expanded to include Cross–Asset Class Research, Equity Derivatives Research, and U.S. Quantitative Equity Strategy Research.

**9.** The position was listed as an invitation "for someone to become a part of this team and work with credit and equity analysts to develop and construct trade recommendations using credit and equity derivative products."

retain her Vice–President's title.[10] She further explained that relocation assistance was included in the offer. Donat asked Rhodes to let her know whether she wanted the job by August 8, 2005. Rhodes did not respond.

On April 16, 2006, Rhodes filed this action in Suffolk Superior Court alleging sex discrimination based on pregnancy, Mass. Gen. Laws ch. 151B, § 4(1) (Count I), retaliation in violation of Mass. Gen. Laws ch. 151B, § 4(4) (Count II), interference with rights protected under Mass. Gen. Laws ch. 151B, § 4(4A) (Count III), aiding and abetting discriminatory practices in violation of Mass. Gen. Laws ch. 151B, § 4(5) (Count IV), and interference with advantageous business relations (Count V).[11] The case was removed by defendants to this court on May 19, 2006.

On October 31, 2007, defendants moved for summary judgment on all counts. On November 1, 2007, Rhodes moved for an extension of time to conduct further discovery. (The discovery deadline had expired on August 31, 2007). The court denied the motion as untimely. Rhodes filed her opposition to summary judgment on

December 21, 2007. She filed thirty-eight exhibits in support of her opposition. However, rather than filing the exhibits with a supporting affidavit, as required by Rule 56(e),[12] Rhodes simply appended them to her opposition.[13] On January 11, 2008, defendants moved to strike the exhibits.[14] Plaintiff opposed the motion on January 25, 2008, and submitted two affidavits, one from herself, and one from her counsel. The affidavits purported to retroactively authenticate the exhibits filed with the opposition. On February 11, 2008, defendants moved to strike the affidavits, claiming that they improperly contained argument, conclusions of law, and statements for which no foundation was provided. On March 7, 2008, the court heard oral argument. At the hearing, the court partially granted defendants' motions to strike. Plaintiff's Exhibits 14, 20, 24, 36, and 37 were struck as inadmissible hearsay.[15] Paragraph 8(c) of Rhodes's affidavit was also struck.[16]

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits,

---

**10.** Rhodes disputes that the job was materially the same as her existing job. She argues that the person sought for Beinstein's group was to be "a part of the team," and not a head of department, which she had been in EDG Strategy.

**11.** JPMSI is named in Counts I and II. Beinstein and Ghartey are named in Counts II, III, IV, and V.

**12.** To be admissible at the summary judgment stage, documents must be authenticated and attached to an affidavit that meets the requirements of Rule 56(e) (personal knowledge and competency). *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir.2000).

**13.** Rhodes also improperly submitted the entire transcript from her deposition instead of the extracts cited in the opposition.

**14.** In addition, defendants specifically objected to Exhibits 14, 20, 24, 27, 28, 29, 36, and 37 as lacking in foundation and/or containing inadmissible hearsay.

**15.** Plaintiff's Exhibit 28, the demand letter sent to defendants by Rhodes's lawyer, was admitted to the extent that the document was not offered for its truth.

**16.** Paragraph 8(c) states: "[Paragraph 10 of the Donat Affidavit attached to defendants' summary judgment] identifies several women who allegedly took maternity leave and returned without incident while reporting to the defendant Joseph Ghartey. In fact only one of the women mentioned, Kimbily DiSpigna, actually reported to Mr. Ghartey at the time she went on leave, and that occurred in July, 2005, after the propriety of my dismissal was already at issue."

depositions, answers to interrogatories, and admissions on file, " 'there is no genuine issue as to any material fact and [where] the moving party is entitled to a judgment as a matter of law.' " *Gaskell v. Harvard Co-op. Soc.*, 3 F.3d 495, 497 (1st Cir.1993), quoting Fed.R.Civ.P. 56(c). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez–Pinto v. Tirado–Delgado*, 982 F.2d 34, 38 (1st Cir.1993). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* The nonmoving party "must adduce specific, provable facts which establish that there is a triable issue." *Id.* There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

*Count II—Retaliation*

■■■ Rhodes contends in Count II that defendants retaliated against her for making a discrimination claim. A prima facie case of retaliation requires a showing that a plaintiff engaged in legally protected conduct,[17] suffered an adverse employment action,[18] and that the two events were causally related. *See Mole v. Univ. of Massachusetts*, 442 Mass. 582, 591–592, 814 N.E.2d 329 (2004). Unless the adverse action comes very closely on the heels of the protected activity, a plaintiff must adduce evidence of causality that goes beyond mere temporal proximity. *See id.* at 595, 814 N.E.2d 329.

■■■ The adverse action alleged by Rhodes is the job elimination/termination letter of June 17, 2005. The earliest instance of arguably "protected conduct" by Rhodes occurred on July 20, 2005, when her lawyer sent a demand letter to JPMSI's general counsel. The offer by JPMSI of a transfer to Beinstein's group, which was made in mid-June (before the demand letter was sent), remained open to at least August 8, 2005. Rhodes offers no evidence that JPMSI withdrew or suspended the offer after receiving the demand letter. Instead, Rhodes chose not to accept the offer for reasons of her own. Where "adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation." *See Mole*, 442 Mass. at 594, 814 N.E.2d 329.[19] Ac-

---

17. Under Mass. Gen. Laws ch. 151B, § 4(4), a plaintiff has engaged in protected activity if she "has opposed any practices forbidden under this chapter or ... has filed a complaint, testified or assisted in any proceeding under [Mass. Gen. Laws ch. 151B, § 5]."

18. An adverse action by an employer consists of any action "to discharge, expel or otherwise discriminate against [the plaintiff]," including coercion, intimidation, or otherwise threatening behavior. Mass. Gen. Laws ch. 151B, §§ 4(4), 4(A). *See also Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir.1996); *King v. City of Boston*, 71 Mass.App.Ct. 460, 468, 883 N.E.2d 316 (2008).

19. At the hearing on summary judgment, Rhodes's counsel claimed that JPMSI knew of her pregnancy discrimination claim as early as May of 2005. There is nothing in the record to support that assertion. Even if

cordingly, defendants' motion for summary judgment as to Count II will be *ALLOWED.*

*Count I—Gender Discrimination (Pregnancy)*

 To establish a prima facie case of pregnancy discrimination, a plaintiff must establish that: (1) she is pregnant (or indicated an intention to become pregnant); (2) she was capable of performing the job at an acceptable level; (3) she was terminated (or suffered some other adverse employment action); and (4) her employer sought a replacement with similar qualifications.[20] *See Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 421 (1st Cir.1996); *Sullivan,* 444 Mass. at 39–40, 825 N.E.2d 522. "If the plaintiff successfully bears this relatively light burden, we presume that the employer engaged in impermissible sex discrimination. If the employer articulates a legitimate, non-discriminatory reason for its decision, however, the presumption of discrimination vanishes, and the burden of production shifts back to the plaintiff. The plaintiff must then introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory. The plaintiff may rely on the same evidence to prove both pretext and discrimination, but the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus." *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 15–16 (1st Cir.1994) (internal citations omitted). In discharge of their burden of production, defendants state that Rhodes's position was eliminated for legitimate business reasons, namely that EDG Strategy (of which Rhodes was the only remaining member) was not generating sufficient revenue and had become largely redundant in light of new technology.

 Summary judgment is a disfavored remedy in discrimination cases. *See Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 439, 646 N.E.2d 111 (1995). A plaintiff can "establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted nondiscriminatory reasons." *Santiago–Ramos v. Cen-*

---

there were, Rhodes has failed to adduce any evidence suggesting a causal relationship between that knowledge and the alleged adverse employment action. Rhodes contends that causality can be inferred from the timing and sequence of events. As a general proposition, this is often true. But, "the mere fact that one event followed another is not sufficient to make out a causal link. That an employer knows of a discrimination claim and thereafter takes some adverse action against the complaining employee does not, by itself, establish causation." *See Mole,* 442 Mass. at 592, 814 N.E.2d 329 (internal citations omitted). Further, even assuming there was evidence indicating that JPMSI knew of Rhodes's nascent discrimination claim in May of 2005, Rhodes (as explained below) has failed to produce sufficient facts from which a jury could find that her employer's reasons for her termination were pretextual. *See id.* at 591, 814 N.E.2d 329 ("Lacking any direct evidence of a retaliatory motive, [the plaintiff] ha[s] the burden of establishing a prima facie case of retaliation, and, in the wake of the defendants' introduction of nonretaliatory reasons for the various actions taken, the burden of proving that the articulated nonretaliatory reasons were pretext.").

**20.** The facts of this case are more akin to a corporate downsizing. Accordingly, no replacement for Rhodes was hired. In such cases, a plaintiff can establish a prima facie case by showing that her employer retained similarly qualified employees outside plaintiff's protected class in similar positions. *See Sullivan v. Liberty Mut. Ins. Co.,* 444 Mass. 34, 44, 48, 825 N.E.2d 522 (2005).

*tennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir.2000) (internal quotation and citation omitted). Generally, the most probative means of establishing pretext is to demonstrate that similarly situated employees were treated differently; the plaintiff must, however, show (consistent with federal Title VII standards), that the persons to whom she seeks to compare herself were similarly situated in "all relevant respects." *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129, 686 N.E.2d 1303 (1997).

 In Rhodes's view, to survive summary judgment she needs only establish a prima facie case supplemented by evidence from which a jury might infer that JPMSI's justifications for her termination are false. This is not an entirely accurate statement of the law. *See Daley v. Wellpoint Health Networks, Inc.*, 146 F.Supp.2d 92, 102–103 (D.Mass.2001).[21] Proving falsity is not always the equivalent of proving that a pretext masks a discriminatory animus. However, this is somewhat beside the point because Rhodes is unable to show that defendants' articulated reasons for her termination are untrue.[22]

Rhodes cites the following six items of evidence as supporting an inference of pretext. First, she was a highly-paid and valued JPMSI executive of long standing. Second, her termination occurred within six weeks of her return from maternity leave. Third, the circumstances of her termination were "highly irregular" because: (i) she was given oral notice by Shelton, to whom she did not report, and who flew to Boston from New York solely for this purpose;[23] (ii) an internal JPMSI e-mail suggests that her dismissal had not actually been approved by senior management as of June 9, 2005;[24] and (iii) the "re-organization" did not result in the termination of a single employee other than Rhodes. Fourth, the company "deliberately concealed" from Rhodes the fact that her job functions were being transferred to New York—rather she only learned through the "rumor mill" that the Beinstein group was being formed. Fifth, no one offered to help her find a comparable

---

21. *See also Matthews*, 426 Mass. at 128, 686 N.E.2d 1303 ("If the defendant's reasons are not discriminatory, and if the plaintiff does not prove that they are pretexts, the plaintiff cannot prevail.").

22. This is a disparate treatment case. Accordingly, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as elaborated in *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), applies. However, as the First Circuit has counseled, at the summary judgment stage, the tripartite burden-shifting framework, while useful, is not to be followed in an overly-rigid manner. *See Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 100 (1st Cir.2007), citing *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996). The court rather should focus on the ultimate question and consider the evidence in its aggregate, with an eye towards whether it sufficiently establishes a genuine

question to be resolved by the fact-finder. Here, Rhodes has earned a presumption of discrimination by establishing a prima facie case. Defendants have adequately rebutted that presumption by producing credible evidence of legitimate, non-discriminatory reasons for their employment decision. But to get past summary judgment, Rhodes must further adduce sufficient evidence that would give rise to a plausible inference of discriminatory animus. As explained below, she has not.

23. There is countervailing evidence in the record that Shelton had a meeting at Fidelity Investments in Boston the day of his conversation with Rhodes.

24. A June 9, 2005 e-mail from Donat to Green and Ghartey stated: "We're trying to get the job elimination for [Rhodes] approved...." Plaintiff's Ex. 29. In Rhodes's view, the e-mail is evidence that Ghartey decided to terminate her on his own without corporate authorization.

position at JPMSI.[25] And sixth, she was not offered a job with the Beinstein group until mid-June, six weeks after she learned that JPMSI was eliminating EDG Strategy. In Rhodes's view, the offer of a new position in New York was a half-hearted attempt by JPMSI to "cover their tracks" because the offer did not include firm assurances about compensation,[26] a job description,[27] or the length of her employment.

In Rhodes's view, the mere existence of Beinstein's group is evidence that defendants lied to her about the circumstances of her termination, that is, that her equity derivatives research job instead of being eliminated was being transferred to New York. She contends that this falsehood shows that defendants' articulated reasons for her termination were a pretext. Accepting Rhodes's version of events, however, requires a complete disregard of the record. Not even Rhodes goes so far as to claim that JPMSI intended to eliminate all firm-wide equity derivatives research. During her deposition, Rhodes acknowledged that there were "hundreds of research analysts" in equity derivatives and that she knew that none of those positions were being eliminated. *See* Rhodes Dep. Tr. Vol. I, pp. 93, 143–146.

The undisputed evidence establishes that by the time Rhodes went on maternity leave, her "group" had, for all practical purposes, ceased to exist. By July of 2004, four months before her leave began, all of the other employees in EDG Strategy had been transferred to other divisions.

In her deposition, Rhodes conceded that she knew that nothing was being done to re-staff the team. Work was so scarce that she spent most of her time doing tasks for Shelton in New York unrelated to her EDG Strategy duties. When she left for maternity leave, JPMSI made no effort to find someone with research skills to compensate for her absence. Instead, Chan, who was an IT specialist, was brought in to do whatever incidental work might arise. When Rhodes returned from her maternity leave in March of 2005, none of her time was spent on research. All of her time was devoted to working on marketing materials for Shelton's group.

A plaintiff can establish pretext by comparing herself to similarly situated employees. However, because Rhodes was the sole remaining member of EDG Strategy, no similarly situated person exists for comparison purposes. She claims that Chan might qualify and points out that he was offered a position in the Beinstein group immediately (he declined), while she had to wait six weeks for a similar offer. But Chan does not qualify—he was an IT specialist, not a researcher, and he was offered a position in the Beinstein group that required technical programming skills.

Rhodes also attempts a comparison with employees that were hired into the Beinstein group in New York. However, these employees (three of whom were women) were working in JPMSI's New York office prior to being recruited by Beinstein. Even assuming they provide proper comparisons, there is no evidence in the record

---

**25.** At her deposition, Rhodes conceded that she never asked anyone in the Boston office for help in seeking out other job opportunities at JPMSI. *See* Rhodes Dep. Tr. Vol. I, p. 99.

**26.** Her base salary was to remain the same, but bonuses were not guaranteed. There was, however, no guarantee of a bonus in her position with EDG Strategy.

**27.** Rhodes acknowledges that her title was to remain unchanged, but she claims to have been refused a written description of the details of her prospective duties and responsibilities. Defendants claim that no one in the Beinstein group had a detailed job description.

indicating that Rhodes was treated differently than the other Beinstein hirees. Rhodes argues that she was not given assurances regarding her compensation, job description, or length of employment. But she has produced no evidence that the other hirees received such assurances. She points to the two interviews she underwent prior to receiving a final offer. But there is no evidence that her interview process was any more arduous than that endured by any one else hired into the Beinstein group. In sum, there is nothing in the record suggesting that Rhodes was treated any differently than other EDG Strategy members or Beinstein group employees. Accordingly, defendants' motion for summary judgment as to Count I will also be *ALLOWED*.

*Count IV—Aiding and Abetting against Beinstein and Ghartey*

 To establish individual liability against Beinstein and Ghartey for aiding and abetting discriminatory conduct, Rhodes must prove that: (1) they had the requisite intent to discriminate against her; (2) that they committed individual and distinct wrongs separate from Rhodes's main claim; and (3) that they knew of their supporting role in an effort intended to deprive Rhodes of a right guaranteed under Chapter 151B. *See Beaupre v. Cliff Smith & Assocs.,* 50 Mass. App.Ct. 480, 495 n. 23, 738 N.E.2d 753 (2000). As there is no evidence to support Rhodes's underlying claim of discrimination, *a fortiori* there is no evidence to support a claim that Beinstein and Ghartey were part of an orchestrated campaign to discriminate against Rhodes. Accordingly, the motion for summary judgment as to Count IV will also be *ALLOWED*.

*Counts III and V—Interference with Advantageous Contractual Relations*

 Rhodes asserts this claim also against Ghartey and Beinstein individually.

"[T]o make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) [s]he had a business relationship or contemplated contract of economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." *Kurker v. Hill,* 44 Mass.App.Ct. 184, 191, 689 N.E.2d 833 (1998). "The nature of an at-will employment contract does not, by itself, preclude a finding that a relationship exists with which there can be tortious interference." *Harrison v. NetCentric Corp.,* 433 Mass. 465, 477, 744 N.E.2d 622 (2001). However, "something more than intentional interference is required." *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 815, 551 N.E.2d 20 (1990) (adopting *Restatement (Second) of Torts* § 766 (1979)). *Cf. Harrison,* 433 Mass. at 479 n. 16, 744 N.E.2d 622 (while in *Geltman,* "we ... abandon[ed] the word malic[ious]" in describing the elements of the tort, "we [nonetheless] continued to define the improper interference required ... in terms of 'actual malice.'"). *See King v. Driscoll,* 418 Mass. 576, 587, 638 N.E.2d 488 (1994) (where a corporate official is named as a defendant, "actual malice" or "a spiteful, malignant purpose" is required to prove the tort). The actual malice requirement places a special burden on a plaintiff if she is to succeed in proving the tort. *See Blackstone v. Cashman,* 448 Mass. 255, 261 n. 10, 860 N.E.2d 7 (2007) ("We now state explicitly what has been implicit in our prior cases: the 'actual malice' standard for proving improper motive or means on the part of a corporate official is a heightened burden placed on the plaintiff, not a defense that must be proved by a defendant."). Thus, where a supervisor is acting within the scope of his corporate

authority in terminating an at-will employee, he is privileged to do so unless his actions are "unrelated to any legitimate corporate interest." *Clement v. Rev–Lyn Contracting Co.*, 40 Mass.App.Ct. 322, 325, 663 N.E.2d 1235 (1996). Because Rhodes has failed to present any evidence that either Ghartey or Beinstein was acting maliciously and outside the scope of their authority or in defiance of the corporate interest, Counts III and V will also be *DISMISSED*.

### ORDER

For the foregoing reasons, defendants' motion for summary judgment is *ALLOWED* in its entirety. The Clerk will enter judgment for defendants and close the case.

SO ORDERED.